**UNITED STATES of America,**

v.

**Henry BELL, Defendant.**

**No. 71–CR–608.**

United States District Court,
E. D. New York.

Nov. 24, 1971.

Robert A. Morse, U. S. Atty., by George G. Bashian, Jr., Asst. U. S. Atty., of counsel, for plaintiff.

The Legal Aid Society by Edward J. Kelly, Brooklyn, N. Y., for defendant.

## MEMORANDUM and ORDER

COSTANTINO, District Judge.

While attempting to board an Eastern Airlines flight leaving LaGuardia Airport for Georgia on November 28, 1970, the defendant was placed under arrest by a Deputy United States Marshal after a frisk of the defendant revealed approximately 40 grams of heroin in his possession. By a single count indictment filed in this court on June 8, 1971, the defendant is charged with violating the federal narcotics law, 21 U.S.C. §§ 173, 174 (1970). The defendant has now moved to suppress the evidence. The essential task before the court is to determine the existence or nonexistence of sufficient cause to justify the frisk that resulted in the discovery of heroin and the subsequent arrest and prosecution of the defendant.

At the root of the defendant's motion is the constitutional validity of the anti-hijacking system now employed at major airports within the Eastern District of New York. The constitutional questions raised by the use of this system, however, are not of first impression in our court. In a lengthy and erudite opinion, United States v. Lopez, 328 F.Supp. 1077 (E.D.N.Y. 1971), Judge Weinstein has upheld the constitutionality of the anti-hijacking system. Though Judge Weinstein's views are not binding upon this court, the court does find them persuasive. For this reason and for those stated below, this court holds the system to be constitutional. Consequently, since the evidence at a hearing before the court points to scrupulous application of the system which, in turn, led to the discovery of the heroin on the person of the defendant, the defendant's motion to suppress the evidence must be denied.

## The Anti-Hijacking System

In an attempt to reduce incidents of air piracy, and after considerable study, a Task Force, appointed in 1968, devised a field screening system to detect potential air pirates. Since Judge Weinstein describes the system at length in *Lopez*, 328 F.Supp. at 1082–1085, no useful purpose would be served by attempting to duplicate his findings here. It suffices to say that the testimony before this court of airline employees and deputy marshals leads to the inescapable conclusion that the anti-hijacking system instituted by the Federal Aeronautics Administration, was followed without variation. Nevertheless, three aspects of the system specifically relating to pre-flight apprehension, merit further inquiry: (1) profile selection; (2) magnetometer detection and (3) the "stop and frisk."

## Profile Selection

All passengers boarding aircraft at airports in which the FAA's anti-hijacking system is operational are subject to the system. The system utilizes several screening techniques that, cumulatively, reduce the number of passengers that may be subjected to a stop and frisk by a Deputy United States Marshal—an eventuality to which all passengers are alerted by large signs, both in English and Spanish, prominently displayed in the boarding areas. See Government's Ex-

hibit #6, in evidence. The initial screening technique is a determination by airline employees, without the intervention or assistance of Government employees, that a passenger's characteristics match a certain "profile." Once such a "selection" is made, airline employees are alerted that the "selectee" has failed to clear the initial screening procedure.

The testimony at the hearing[1] on this motion revealed that the characteristics employed in creating the profile were gathered purely from criteria designed to single out potential air pirates rather than to discriminate against any class of persons on the basis of race, national origin or beliefs, whether religious or political.[2] Hence, coupled with the

1. Before hearing this motion, the Government made an application to the court that part of the hearing be *in camera,* to the exclusion of the general public as well as the defendant. The Government grounded its application on its contention that should any of the profile characteristics become generally known, the effectiveness of the entire system would be seriously compromised. Exclusion of the defendant and the public from a portion of a public trial, however, raises questions concerning rights so precious that they are secured to the People in the Bill of Rights. See U.S.Const. amends. V–VI (the right of the defendant and the public to a public trial and the right of the defendant to confront witnesses against him). On the other hand, it is equally clear that these rights are hardly absolute. See, e.g., Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (defendant may be excluded from courtroom to preserve order and decorum) ; Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (limitations on media coverage to protect defendant's right to a fair trial). Considering the grave threat to the anti-hijacking system should information about profile characteristics reach beyond those the court could reasonably be expected to police, *i.e.,* counsel and court personnel, the court concluded that, given substitute procedures to protect the rights of the defendant, *infra,* the constitutional pendulum had swung in the Government's favor. Thus, the Government's application was granted. In so ruling, the court is in accord with the reasoning of Judge Weinstein in *Lopez.* 328 F.Supp. at 1087–1092.

To deal with the far more difficult of the two constitutional problems, the right of the defendant to confront witnesses against him, the court informed defense counsel that if at any time during the *in camera* proceedings he felt the necessity to consult with the defendant to prevent infringement of a substantial right, he could inform the court of this necessity and the court would reconsider its preliminary ruling granting the Government's

request for *in camera* proceedings. Though no such request was in fact made, had defense counsel made such a request and had the court found it meritorious, the Government would have been forced to elect between revealing the secret information to the defendant or discontinuing the prosecution. As Judge Weinstein correctly pointed out in *Lopez, id.* at 1090–1092, by analogy to decisional law regulating the use of informants, persuasive precedent does exist both for *in camera* disclosure and for forcing a Government election between disclosure and prosecution. See McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967) ; Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Viewed in this light, any infringement of the defendant's right to confront the witnesses against him resulting from the court's decision to bar the defendant from *in camera* proceedings was minimized to a constitutionally acceptable level.

2. In passing upon the validity of the identical FAA "profile," Judge Weinstein relied upon testimony detailing the procedures that led to its development. That testimony included, among other things, statistical, sociological and psychological data. This court, having been assured by reviewing the testimony before it, that the profile did not rely on characteristics, the use of which might be constitutionally impermissible, takes judicial notice of Judge Weinstein's finding that the profile did rely on characteristics related to the pre-flight apprehension of air pirates. In taking judicial notice, despite the Government's offer to make the same proof available at this hearing, the court concluded that the scientific reliability of the profile (and the magnetometer, *infra*) has been sufficiently proven in *Lopez* to permit conservation of judicial time and energy through the device of judicial notice. This type of *stare decisis* development is an application of blackletter law. See J. Maguire, J. Weinstein, J. Chadbourne & J. Mansfield, Cases and Material on Evidence, 26–29, 64–66 (5th ed. 1965). Of course, by taking judicial

other screening techniques of the anti-hijacking system, profile selection can act as a neutral and objective informant, see *Lopez, supra*, 328 F.Supp. at 1090–1092, warning the deputy marshal of the presence of a potentially armed and dangerous air pirate, with all the attendant risk of serious physical harm to the officer himself as well as to members of the public nearby.

■ The evidence educed at the hearing shows unquestionably that the defendant did meet the profile and that he was in fact designated a selectee. Unlike *Lopez, id.* at 1101–1102, however, the airline employees have scrupulously applied the profile without any additions or subtractions. The profile they applied was the profile in the exact form authorized by the FAA. Since there were no abuses in application of the profile, on this point, no valid constitutional objection can be raised by the defendant.

### Magnetometer Detection

The magnetometer is an electronic weapons detector installed on the "jetway," *i. e.*, boarding ramp near the boarding agent's station. When a passenger having metal on his person equal to or greater than the amount of metal in an average .25 caliber gun passes through the magnetometer's magnetic field, a warning light flashes and a reading is visible on a meter. A scientific foundation for the magnetometer's design and construction was established by expert testimony at the hearing conducted by Judge Weinstein in *Lopez*. *Id.* at 1085–1086. Judge Weinstein found further that magnetometer operation required no understanding of its underlying scientific theory and that calibration was a simple process, verifiable by visual observation. *Id.* at 1086. In order to save time and

effort, at the suggestion of the Government, this court took judicial notice of the magnetometer's capabilities.[3]

The testimony at the hearing before this court established that a magnetometer had been installed on the jetway leading to the flight the defendant had intended to take to Georgia. The testimony also revealed that the defendant was a selectee and that he did trigger the magnetometer. Since the defendant had failed to clear these initial screening procedures, he was stopped by the boarding agent and requested to furnish identification. When he could not do so, a Deputy United States Marshal was summoned.

An Eastern Airlines employee charged with the responsibility of maintaining the magnetometer equipment testified at the hearing that, in the normal course, magnetometers were calibrated once or twice a week. Describing the method of calibration, the employee testified that an officer armed with a .38 caliber revolver would pass through the magnetic field to determine if the device was sufficiently sensitive. Then, if the officer did trigger the device, using the manufacturer's suggested guide to calibration as a reference, the sensitivity of the device was decreased. The employee was unable to recollect, however, when the magnetometer triggered by the defendant had been last calibrated before the defendant attempted to board the flight on November 28, 1970. On this point, though, Deputy Marshal John Walsh, the arresting officer, testified that he activated the same magnetometer triggered by the defendant when he passed through the magnetic field with his .38 caliber service revolver while responding to the airline's request that he go to the jetway leading to the Georgia flight.

notice the defendant is not foreclosed from showing a discrepancy between the ideal and actual operation. In fact, it was on this basis that the motion to suppress was granted in *Lopez*; a strategy the defense seeks to employ in this action in addition to its general challenge to the constitutionality of the system that led to

to the discovery of the heroin in the defendant's coat.

3. Previously, the court had taken judicial notice, *supra*, of Judge Weinstein's findings on the scientific basis of the profile technique of the anti-hijacking system.

■ Defense counsel argues that nothing in the record indicates that the magnetometer triggered by the defendant had been precisely calibrated to the standard established by the FAA, *i.e.*, metallic weight equivalent to a .25 caliber revolver. Similar in theory to the contention successfully advanced in *Lopez*, the argument is well-taken. The result achieved in *Lopez*, however, is not dispositive here. The deviation from established profile characteristics in *Lopez* was in direct conflict with the scientific basis justifying the use of the profile, while, at the same time, raising serious equal protection questions. *Id.* at 1101–1102. Here, even assuming precise calibration, the magnetometer could be activated by a range of metal objects from a religious medal to a steel arch in a shoe. Hearing Testimony of Supervising Deputy Marshal Michael Pizzi, Nov. 12, 1971. In fact, as Judge Weinstein noted in *Lopez*, the magnetometer is triggered by about 50% of the passengers who pass through its magnetic field. 328 F.Supp. at 1086. Thus, the use of the magnetometer must be viewed within the context of the anti-hijacking system. Had the decision to stop and frisk been made solely on the basis of activating the device, the court might have reached a different result. But the magnetometer is only one of a series of screening procedures; a procedure that serves as much as a deterrent to air piracy as it does a detector. Even if the court found the magnetometer to be over-sensitive, any error in relying on its reading to continue screening would be harmless.[4] In any event, the court finds as a matter of fact that the magnetometer activated by the defendant on November 28, 1970 was operating in accordance with the FAA standards. Though no proof has been offered to prove or disprove calibration on that date, the Government's evidence as to custom and practice of calibration stands unrefuted. With this factual basis, the court holds that no error was committed in relying on the magnetometer reading.

### Stop and Frisk

Under the anti-hijacking system, when a selectee triggering the magnetometer fails to produce satisfactory identification, the airline employee calls a deputy marshal.[5] Deputy Walsh, making what amounted to an investigatory stop, identified himself and again asked the defendant to produce identification. When the defendant told him he had just been released from jail and had no identification, much less satisfactory identification, Deputy Walsh requested him to pass the magnetometer a second time. The defendant complied, again activating the device. At this point, still following the procedures established by the FAA, the defendant was requested to submit to a voluntary search. The defendant consented to the request. Deputy Walsh, working alone, testified under cross-examination, however, that at the time he requested the frisk he was in fear that the defendant might be carrying a dangerous weapon.

Deputy Walsh then conducted a frisk, or pat-down, of the defendant's exterior clothing. Feeling two hard bulges about five inches in length, the deputy marshal asked the defendant what they were. Deputy Walsh testified, though his testimony is controverted by the defendant,

---

4. At the hearing, the defendant testified that the only metal on his person consisted of one door key and several coins. Unfortunately, no record of the defendant's possessions was made before his release on bail. Two deputy marshals, however, controvert the defendant's story. Both state, essentially, that the defendant had in his possession several coins, a key ring with several keys and a large Afro-style metal comb that was about six inches long and two to three inches wide.

One deputy marshal, Michael Pizzi, testified that he even considered labeling the comb a dangerous weapon. These items would be sufficient to activate the magnetometer.

5. In this case, Deputy Marshal Walsh had been summoned to the jetway before the defendant triggered the magnetometer. Deputy Walsh witnessed the initial activation of the magnetometer by the defendant.

that the defendant told him the bulges were bags of candy for his mother. After the defendant complied with the request to remove and open one of the bags, peering into it, Deputy Walsh observed several glassine envelopes. A field test revealed the envelopes contained heroin. The defendant was then formally placed under arrest and apprised of his rights.

The frisk of the defendant may be supported on either one of two grounds: as a consent search or as a search for weapons where a reasonably prudent officer has reason to believe the person to be searched is armed and dangerous and that the officer's safety or the safety of others is endangered, Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Consent searches, however, involve the waiver of a fundamental guarantee of the Bill of Rights. To meet constitutional standards, the consent must be proved, by clear and positive evidence, to be voluntary, unequivocal, specific and intelligently given rather than resulting from duress or coercion, whether actual or implied. United States v. Como, 340 F.2d 891, 893 (2d Cir. 1965); United States v. Smith, 308 F.2d 657, 663 (2d Cir. 1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963). Here, though both Deputy Walsh and the defendant are in accord that the defendant said "sure" to the deputy marshal's request to a custodial frisk, other evidence indicates that the frisk would have been conducted with or without the defendant's consent. Moreover, since the court finds the search supportable on the second ground, *infra*, the court elects to uphold the frisk on that ground rather than infer a waiver of a constitutional right.

The constitutional validity of the frisk of the defendant can be upheld under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Before a valid search for weapons can be conducted, however, the searching officer must have reason to believe that a probability of danger exists because the person to be searched is carrying a weapon. Sibron v. New York, 392 U.S. 40, 64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Whether an officer is prudent and whether he has reason to believe the requisite danger to exist justifying a weapons search, are questions inextricably bound to the facts surrounding a particular search. There is no standard quantum of reasonableness fixed by case law or statute that the officer in the field or a reviewing court can apply. Rather, *Terry* requires a balancing of interests—the Government's interest to prevent crime in its formative stages as opposed to the individual's right to privacy and the right to be free from oppressive search techniques. 392 U.S. at 22, 28–29, 88 S.Ct. 1868, 20 L.Ed. 2d 889.

It is clear from the testimony of Deputy Walsh that the frisk he conducted of the defendant was solely a search for weapons. The testimony is also undisputed that the search was conducted in a reasonable manner.[6] It is also clear that the deputy marshal was advancing a serious governmental interest—the prevention of air piracy; a crime normally committed with a dangerous weapon that could potentially cause death or serious injury to many innocent bystanders. Here, the search was conducted because an objective system used to detect air pirates had indicated that the defendant was one of a class of less than 1% of all air passengers, *i.e.*, a potentially armed and dangerous air pirate. *Lopez, supra,* 328 F.Supp. at 1084. Furthermore, of that select group, almost 6% of those actually frisked were found to have a weapon. *Id.* at 1097. On balance then, the court finds the intrusion into the defendant's person by the frisk search for weapons justifiable and constitutional.

6. When the defendant could not produce satisfactory identification, Deputy Walsh requested that the defendant accompany him to a small room adjacent to the jetway. The defendant went without resistance. Closing the door, the frisk was performed out of the view of the general public.

The fruits of the search for weapons here, however, were illicit narcotics rather than a weapon. Nevertheless, the hard bulges felt by the deputy marshal in his pat-down could have been pistols or explosive devices. A law enforcement officer need not close his eyes to one form of contraband merely because he was searching for another. If the search is consistent at its inception with the dictates of the Fourth Amendment, a law enforcement officer can seize any contraband unearthed in the course of such a lawful search. See Harris v. United States, 331 U.S. 145, 155, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), overruled on other grounds, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Therefore, the court concludes that the contraband seized during this search for weapons prompted by strict adherence to the FAA's anti-hijacking system is admissible against the defendant.

### Conclusion

For the reasons stated in this memorandum opinion, the defendant's motion to suppress evidence must be and is hereby denied.

So ordered.