**UNITED STATES of America,**
**Appellee,**

v.

**Cecil Kenton EPPERSON, Appellant.**

**No. 71–1481.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 6, 1971.

Decided Feb. 7, 1972.

------

Andrew E. Colclough, Arlington, Va. (Court-appointed counsel) (Adams, Porter, Radigan & Mays, Arlington, Va., on the brief), for appellant.

K. Gregory Haynes, Special Asst. U. S. Atty. (Brian P. Gettings, U. S. Atty., on the brief), for appellee.

Before BOREMAN, Senior Circuit Judge, and CRAVEN and FIELD, Circuit Judges.

CRAVEN, Circuit Judge:

Epperson was convicted in the United States Magistrates Court, Alexandria, Virginia, of violating 49 U.S.C.A. § 1472(*l*) by attempting to board an aircraft engaged in interstate commerce while carrying a concealed dangerous weapon. After unsuccessful appeal to the United States District Court for the Eastern District of Virginia, the case is now before us for review. We affirm.

Epperson was arrested on November 29, 1970, at Washington National Airport while boarding a flight to New York City. After giving his ticket to an agent at the gate, he proceeded toward the airplane. Passengers on this flight were exposed to a metal detecting device called a magnetometer. As Epperson passed by the instrument it disclosed an unusually high reading. The United States Marshal using the magnetometer then asked Epperson if he were carrying a large amount of metal. Epperson produced several metal objects, but the device still gave a positive reading to his person. Thereupon the marshal searched the jacket Epperson was carrying and found a loaded .22 caliber pistol.

Epperson claims that the pistol and ammunition should not have been introduced into evidence because they were the products of an illegal search. He argues that (1) the use of the magnetometer was a "search", and (2) since there was no warrant and the circumstances do not fall within any of the recognized exceptions to the warrant requirement, the search was in violation of the Fourth Amendment.

We agree that the use of the magnetometer in these circumstances was a "search" within the meaning of the Fourth Amendment. By this device a government officer, without permission, discerned metal on Epperson's person. That he did so electronically rather than by patting down his outer clothing or "frisking" may make the search more tolerable and less offensive—but it is still a search. Indeed, that is the very purpose and function of a magnetometer: to search for metal and disclose its presence in areas where there is a normal expectation of privacy.

We also agree that the limited search by magnetometer does not fall within any of the recognized exceptions to the warrant requirement of the Fourth Amendment except that suggested by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We think that case controls this one, although the reason in *Terry* for dispensing with the ordinary warrant requirement is not the same as here.

In *Terry* an experienced police officer observed two men in broad daylight passing and peering into a store window 12 times. They walked away together and met a third man with whom they had talked briefly before. The confrontation then occurred, resulting in the officer's frisking their outer clothing and in the seizure of two weapons. There was no warrant, no probable cause for

arrest, no probable cause for search for evidence of crime, but suspicious circumstances sufficient to " 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Terry, supra* at 22, 88 S.Ct. at 1880. The issue was said to be "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry, supra* at 27, 88 S.Ct. at 1883.

The limited scope and purpose of the search plus the element of danger and the necessity for swift action excused getting a warrant in *Terry*. It is impossible to catalog the myriad circumstances that enter into the selection of a given aircraft flight for magnetometer surveillance. Indeed, the entire anti-hijacking program is necessarily shrouded in secrecy. United States v. Lopez, 328 F.Supp. 1077 (E.D.N.Y.1971). Ordinarily the securing of a warrant is supported by an affidavit of facts and circumstances sufficient to enable an impartial magistrate to judge its necessity and justification, but air piracy and its threat to national air commerce is known to all and may be judicially noticed. To require a search warrant as a prerequisite to the use of a magnetometer would exalt form over substance, for it is beyond belief that any judicial officer would refuse such a warrant with or without a supporting affidavit. The danger is so well known, the governmental interest so overwhelming, and the invasion of privacy so minimal, that the warrant requirement is excused by exigent national circumstances. Cf. Thomas v. United States, 372 F.2d 252, 254 (5th Cir. 1967); Witt v. United States, 287 F.2d 389, 391 (9th Cir.), cert. denied, 366 U.S. 950, 81 S.Ct. 1904, 6 L. Ed.2d 1242 (1961) (border searches).

The Constitution does not forbid searches and seizures: it forbids only those that are unreasonable. Elkins v. United States, 364 U.S. 206, 222, 80 S. Ct. 1437, 4 L.Ed.2d 1669 (1960). "The warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard." Camara v. Municipal Court, 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1966). The reasonableness of any search must be determined by balancing the governmental interest in searching against the invasion of privacy which the search entails. These interests must be balanced at two stages: the search must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry, supra,* 392 U.S. at 20, 88 S.Ct. at 1879.

We think the search for the sole purpose of discovering weapons and preventing air piracy, and not for the purpose of discovering weapons and precriminal events, fully justified the minimal invasion of personal privacy by magnetometer. The use of the device, unlike frisking, cannot possibly be "an annoying, frightening, and perhaps humiliating experience," *Terry, supra* at 25, 88 S.Ct. at 1882, because the person scrutinized is not even aware of the examination. Thus it is "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry, supra* at 20, 88 S.Ct. at 1879. Those circumstances reveal an overwhelming governmental interest in subjecting airline passengers to the discovery of unusual quantities of metal upon them. Up to June 1970, there occurred 80 instances of air piracy of passenger aircraft. These crimes, endangering the lives of thousands of people, involved the use of 55 firearms, 20 knives, and 14 bombs. After adoption of the anti-hijacking system, described in the *Lopez* case, *supra,* including limited use of the magnetometer, air piracy instances decreased to about half the rate of the year 1969. It is difficult to imagine a more frightening and danger-

ous event than armed piracy of a passenger aircraft in flight. The extreme penalty [1] reflects the concern of the Congress and at the same time enhances the probability that a desperate man will destroy the aircraft and the lives of all aboard rather than fail in his attempt. It is clear to us that to innocent passengers the use of a magnetometer to detect metal on those boarding an aircraft is not a resented intrusion on privacy, but, instead, a welcome reassurance of safety. Such a search is more than reasonable; it is a compelling necessity to protect essential air commerce and the lives of passengers. The rationale of *Terry* is not limited to protection of the investigating officer, but extends to "others . . . in danger." *Terry, supra,* 392 U.S. at 30, 88 S.Ct. 1868, 20 L.Ed.2d 889. That all passengers are endangered by the presence of weapons on aircraft needs no exposition.

 When the high metal indication of the magnetometer was not satisfactorily explained by Epperson, the subsequent physical "frisk" of his jacket was entirely justifiable and reasonable under *Terry.* At this stage of the encounter the reasonable fear of the marshal for the safety of airline passengers increased and he was entitled, for their protection, to conduct a carefully limited search of the clothing of Epperson in an attempt to discover weapons which might be used for air piracy. Since the use of the magnetometer was justified at its inception, and since the subsequent physical frisk was justified by the information developed by the magnetometer, and since the search was limited in scope to the circumstances which justified the interference in the first place, we hold the search and seizure not unreasonable under the Fourth Amendment.

Affirmed.

---

[1] "[D]eath if the verdict of the jury shall so recommend . . . ." 49 U.S.C.A. § 1472(i) (1) (A).