**UNITED STATES of America,**

v.

**Edward A. SLOCUM, Appellant.**

**No. 72–1231.**

United States Court of Appeals, Third Circuit.

Argued June 13, 1972.

Decided July 19, 1972.

Richard Newman, Newark, N. J., for appellant.

William A. Carpenter, Jr., Asst. U. S. Atty., Newark, N. J., for appellee; John J. Berry, Asst. U. S. Atty., Newark, N. J., on the brief.

Before SEITZ, Chief Judge, and VAN DUSEN and ADAMS, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

The defendant appeals from his district court conviction for possession of, with intent to distribute, cocaine in violation of 21 U.S.C. § 841(a) (1).

Defendant Slocum was arrested at Newark Airport by a Deputy United States Marshal assigned to the airport's Anti-Air Piracy Squad. Defendant had purchased a one-way ticket on a flight to Mexico City which included a stopover in Atlanta. The ticket agent had alerted the marshal that defendant's characteristics conformed to the Federal Aviation Administration's Anti-Air Hijack Profile ("the Profile"). Thus, as defendant accompanied other passengers through a magnetometer set up at the boarding gate the marshal monitored him with particular care. The magnetometer was designed and calibrated to detect the presence of metal objects with substantial ferrous content carried by a passenger either on his person or inside his carry-on luggage. Defendant registered a clearly positive reading which prompted the marshal to intercept him and request positive identification. Defendant's ticket was issued to "Ed Clark." However, he could provide no identification. Consequently, the marshal requested that defendant move to a location away from the boarding area where a pat-down search could be conducted. No weapons or explosives were found as a result of this search so the marshal then proceeded to inspect defendant's luggage. This search revealed a rolled up sock which the marshal described as concealing a "definite foreign substance." The marshal asked that the contents of the sock be identified. But defendant responded only that he did not wish the sock unrolled. This intensified the marshal's suspicion that the substance might be an explosive. He opened the sock and discovered a plastic bag containing a white powdery substance. Suspecting the powder to be some type of illegally possessed narcotic the marshal placed defendant under arrest. Tests subsequently confirmed that the bag contained 131 grams of cocaine.

Defendant challenges his conviction for possession of the cocaine on several grounds.

### (1) CONSTITUTIONALITY OF THE PROGRAM

Defendant initially challenges the constitutionality of the pre-boarding screening program as designed by the Federal Aviation Administration. Consideration of defendant's challenge requires a summary of the program's various procedural components. See United States v. Lopez, 328 F. Supp. 1077, 1082–1085 (E. D.N.Y. 1971). If the program is in effect for a particular flight, screening begins when airline personnel process a

passenger for boarding. The employees directly engaged in pre-flight passenger processing evaluate each passenger according to the FAA Profile. The Profile was developed by a group of professionals representing a cross-section of the various fields of expertise relevant to the hijacking problem. In its entirety the Profile establishes approximately twenty-five characteristics which studies have shown to be held in common by past hijackers. Several of these characteristics, all of which are readily discernible, are used by the airline personnel to screen passengers preliminarily.

If a passenger conforms to the Profile, airline personnel then alert either other employees or available U. S. marshals stationed at the boarding gate to observe the passenger carefully as he proceeds to board. Located at the boarding gate is the magnetometer and all passengers are required to pass through it. However, only the readings registered by passengers who have conformed to the Profile are noted. The magnetometer is calibrated to indicate a positive reading only if the amount of ferrous metal on a passenger or in his hand luggage equals or exceeds that typically incorporated into a small handgun. If the noted reading is neutral the particular passenger boards without further inquiry or surveillance. On the other hand, if a positive reading is noted the particular passenger is requested to pause for questioning. Basically, the questioning is limited to identification and short inquiries concerning what in the passenger's possession might have triggered the magnetometer. According to recommended procedures the passenger should be asked to divest himself temporarily of anything metallic and again move through the magnetometer. Only if he registers a second positive reading should he still not be permitted to board. Instead, he should be escorted beyond the boarding area and frisked for weapons or explosives. If none are found a request then should be made to search the passenger's hand luggage. The passenger should be arrested if the frisk or search discloses a weapon, explosives or contraband. Otherwise, he should be permitted to board.

Defendant challenges the constitutionality of this screening program on several grounds. Specifically, he contends that: (a) the use of the magnetometer without pre-existing probable cause is an unconstitutional search, the fruits of which are inadmissible; (b) the Profile does not satisfy the particularization requirement of the 4th Amendment; and (c) no exceptional circumstances existed at the time of boarding to justify the search of his luggage without a warrant.

(a) *the magnetometer*

■ The short answer to defendant's challenge directed against use of the magnetometer is provided by United States v. Epperson, 454 F.2d 769, 771 (4th Cir. 1972), cert. denied, 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334. The court there observed that "[t]he danger [incident to air piracies] is so well known, the governmental interest so overwhelming, and the invasion of privacy so minimal, that the warrant requirement is excused by exigent national circumstances." As emphasized in *Epperson*, "[t]he Constitution does not forbid searches and seizures: it forbids only those that are unreasonable." Id. Indeed, the underlying purpose of the warrant requirement announced by the 4th Amendment is "to guarantee that [the] decision to search . . . is justified by a reasonable governmental interest." See Camara v. Municipal Ct., 387 U.S. 523, 539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1966). Reasonableness is the ultimate standard. And, we conclude that within the context of a potential hijacking the necessarily limited "search" accomplished by use of the magnetometer *per se* is justified by a reasonable governmental interest in protecting national air commerce. Under the circumstances suggesting a potential for the serious consequences incident to hijackings, employment of the magnetometer does not violate the 4th Amendment.

### (b) *the Profile*

 Prior to boarding a designated flight all passengers must pass through the magnetometer. Of course, as defendant is quick to point out, only a passenger who initially has met the Profile will be monitored for a positive reading. Defendant's position on appeal is not entirely clear. However, he apparently views the role of the Profile in the overall screening process as an attempt to establish, statistically, probable cause for the purpose of subsequently justifying use of the magnetometer. As earlier concluded, however, the justification for the magnetometer exists independently from the Profile.

The practicalities of commercial air transportation dictate that any attempts to discover potential hijackers among scheduled flight passengers be carried out with minimum disruption of the boarding procedures. The Profile meets in part this objective by immediately restricting application of the intrusive aspects of the program. Its compilation of easily observable, nondiscriminatory indicia characteristic of the hijacking problem focuses the program on a limited number of persons among each group of boarding passengers. We cannot conclude that solely because the Profile operates on the basis of a statistical comparison of the passengers to past hijackers that, necessarily, it should be considered as an attempt to establish probable cause and, therefore, be subject to scrutiny according to 4th Amendment standards.

Defendant emphasizes that the testimony of a government witness disclosed that no effort has been made to distinguish characteristically, within the Profile, between hijackers and those who under the program have been searched and arrested for offenses unrelated to hijacking (e. g., illegal possession of narcotics). Defendant argues that the entire program can be justified only as an effort to ferret out potential hijackers and, therefore, the percentage of those passengers conforming to the Profile who are not hijackers must be shown to be *de minimis* before the use of the Profile can be constitutionally sustained. In view of our conclusion that use of the Profile to limit the monitoring process is not controlled by the 4th Amendment we find no merit in defendant's contention.

### (c) *the search of defendant's hand luggage*

 Defendant asserts that the search of his luggage was unconstitutional since there was neither a warrant nor exceptional circumstances to support the search in the absence of a warrant. We conclude that the circumstances existing at the time sufficiently justified the search without a warrant. Defendant's characteristics had conformed to those announced by the Profile. Therefore, the United States Marshal monitored defendant as he passed through the magnetometer. A positive reading caused the Marshal to identify himself, stop defendant and examine defendant's boarding pass. The Marshal requested identification but defendant could produce none. This prompted the Marshal to ask that defendant accompany him beyond the loading area so that a frisk for weapons or explosives might be conducted. Defendant cooperated. It was only after the frisk failed to disclose anything which might have triggered the magnetometer that the Marshal requested that defendant open his luggage.

We cannot conclude that the search of defendant's hand luggage was not justified by exceptional circumstances. Indeed, in view of the Marshal's duty while stationed at the boarding gate, he acted properly when faced with the lack of identification and defendant's failure to explain satisfactorily what in his possession might have caused the positive reading on the magnetometer. Cf. United States v. Lindsey, 451 F.2d 701, 704 (3d Cir. 1971), cert. denied, 405 U.S. 995, 92 S.Ct. 1270, 31 L.Ed.2d 463 (1972).

**1184**

### (2) FAILURE TO FOLLOW RECOMMENDED PROCEDURES

Defendant contends that the cocaine ultimately discovered in his hand luggage was inadmissible since the Marshal had deviated from the procedures recommended under the FAA program. Specifically, defendant points out that the Marshal failed to request that defendant, without his luggage, pass through the magnetometer a second time. It is perhaps desirable that all recommended procedures in fact be adopted. Nevertheless, we do not conclude that the facts here require suppression of the seized cocaine. The omitted step would have performed the same function served by the frisk to which defendant consented. Either approach would have produced neutral findings as to defendant himself and focused the inquiry on the contents of defendant's luggage.

### (3) THE IN CAMERA PROCEEDING

Defendant's final contention is that the court committed reversible error by excluding all persons from the courtroom, other than testifying witnesses and counsel, while taking evidence concerning the Profile. He asserts that the only defense available to him was the unconstitutionality of the search and seizure which turned, essentially on the contents and application of the Profile. We have concluded, however, that the justification for the search of defendant's luggage did not turn on the Profile. Regardless of the fact that "the Profile set the whole air anti-hijacking procedure in motion," the Profile was not necessary to validate the Marshal's ultimate seizure of the cocaine.

If the contents and application of the Profile were germane to defendant's contention concerning the search and seizure, it remains that the in camera proceeding was necessary to perpetuate the secrecy of the Profile. The value of the Profile in delineating those passengers to be monitored might be destroyed if its contents were publicly revealed. Thus, the public interest requires that defendant be satisifed in the assurance that the court itself has reviewed the Profile and determined that the characteristics which it specifies are objectively cognizable and do not discriminate against any group on the basis of religion, origin, political views, or race. Cf. United States v. Lopez, 328 F.Supp. at 1086–1087. Likewise, we are satisfied that defendant's characteristics at the time of his attempted boarding conformed to those catalogued by the Profile.

### Conclusion

The judgment of the district court will be affirmed.