UNITED STATES of America,
Plaintiff,

v.

John Kenneth MEULENER, Defendant.

Crim. No. 10931–CD.

United States District Court,
C. D. California.

Dec. 4, 1972.

William D. Keller, U. S. Atty., Eric A. Nobles, Asst. U. S. Atty., Chief, Crim. Division, Darrell W. Mac Intyre, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

Pines & Dunn, James R. Dunn, Beverly Hills, Cal., for defendant.

## MEMORANDUM OPINION

FERGUSON, District Judge.

While attempting to board an American Airlines flight from Los Angeles International Airport to Chicago on August 2, 1972, the defendant was placed under arrest by a Deputy United States Marshal after a search of his suitcase and person revealed a quantity of narcotics. In a two-count indictment, the defendant is charged with violating 21 U.S.C. § 841(a)(1). He has moved to suppress the evidence found by the search.

The facts revealed at the hearing are as follows:

1. The defendant was the last passenger to attempt to board the flight; all other passengers were on board.

2. Carrying a small suitcase, he checked in at the boarding gate at approximately 12:25 A.M. The ticket agent determined that the defendant met the Federal Aviation Administration "profile" developed to detect potential hijackers, and notified the deputy marshal attending the magnetometer in front of the passageway to the aircraft.

3. As the defendant passed by the magnetometer, it registered positive for the presence of metal.

4. The marshal then ordered the defendant to open his suitcase, and, when he hesitated, repeated the order.

5. At that time, the defendant was under arrest although not told that he was. The marshal had made the determination that the defendant could not leave under any circumstances.

6. The marshal did not ask what was in the suitcase before searching it. Moreover, he did not indicate that the defendant had any choice regarding consent to the search, nor inform the defendant that he could choose not to undergo the search provided he did not board the aircraft.

7. The defendant testified that he would not have attempted to board the aircraft had he been given the opportunity to decline to undergo the search.

8. The defendant, after some hesitation, opened the suitcase with his key. The marshal detected an odor of marijuana. He then observed a white plastic bag in the rear of the suitcase and asked the defendant what it contained. The defendant replied, "It's not a bomb."

9. The marshal suspected that the bag might contain an explosive device and searched it, discovering a quantity of marijuana. At the time of the search of the suitcase, no attempt had been made to search the defendant's person.

10. The marshal then placed the defendant under formal arrest for possession of marijuana with intent to distribute it.

11. The defendant was taken to the marshal's office in the terminal, where a further search was made of the suitcase and, for the first time, of the defendant's person. A small box containing additional narcotics was found in the suitcase, and a quantity was also found in the defendant's pants pocket.

The court holds that the defendant's Fourth Amendment rights were violated when he was not told at the time the search was initiated that he had a right to refuse to submit to the search provided he did not board the airplane. As there was no probable cause for the defendant's arrest at the time he attempted to board, the only factors cited to support the search of his suitcase were that he met the hijacker profile and that the magnetometer registered positive. While the marshal was entitled to insist that the defendant undergo a carefully limited search for weapons or explosives if he attempted to board the airplane, the defendant was entitled to be given the choice of undergoing the search and boarding the airplane, or declining to be searched upon the condition that he not board the airplane. There is no indication that the defendant's behavior was such that the marshal was justified in searching or detaining him if he chose not to board the aircraft.

As a separate and independent ground of decision, the court finds that the search violated the defendant's Fourth Amendment rights because its scope was not limited in accordance with constitutional requirements.

The Fourth Amendment states, "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . ." In United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), the Court held that "[i]t is unreasonable searches that are prohibited by the Fourth Amendment," and that the test of reasonableness "depends upon the facts and circumstances —the total atmosphere of [each] case." 339 U.S. at 60, 66, 70 S.Ct. at 432, 435. The *Rabinowitz* standard was overruled in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), which held that reasonableness was to be determined not in a pragmatic fashion, but rather in the context of the Fourth Amendment. The *Chimel* Court concluded that the government's "reasonableness" argument was

> "founded on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests. Under such an unconfined analysis, Fourth Amendment protection in this area would approach the evaporation point. . . ." 395 U.S. at 764–765, 89 S.Ct. at 2041.

The Court held that the "facts and circumstances" of the *Rabinowitz* test "must be viewed in the light of established Fourth Amendment principles." 395 U.S. at 765, 89 S.Ct. at 2041.

The *Chimel* holding has met with reluctance on the part of lower courts. For example, in United States v. Slocum, 464 F.2d 1180 (3rd Cir.), decided as recently as July 19, 1972, the court still speaks of reasonableness in the sense of *Rabinowitz*.

In cases involving areas of great public concern, it is easy to succumb to the expediency of the moment and, contrary

to the Constitution, adopt the principle that the end justifies the means.

All reasonable men are aware that aircraft hijacking and the traffic in narcotics have reached serious proportions. These problems, however, as all other great problems of the past and the future, must be solved in the context of our Constitution, or else the principles upon which this Nation was founded will have disappeared in the cloud of fear.

There are three grounds relevant to the instant case which may justify a physical search by a law enforcement officer in the absence of a search warrant: (1) the existence of probable cause for arrest; (2) consent to the search; or (3) a limited search for weapons, where a reasonably prudent officer has reason to believe that the person to be searched is armed and dangerous and that the safety of the officer or of others is endangered.*

### Probable Cause

It is clear that in the instant case, probable cause was not present. *See* Adams v. Williams, 407 U.S. 143, 148, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); United States v. Epperson, 454 F.2d 769, 770–771 (4th Cir.), cert. denied, 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972); United States v. Lopez, 328 F. Supp. 1077, 1093 (E.D.N.Y. 1971). And "[i]t is axiomatic that an incident search may not precede an arrest and

serve as part of its justification." Sibron v. New York, 392 U.S. 40, 63, 88 S. Ct. 1889, 1902, 20 L.Ed.2d 917 (1968).

### Consent

A search may be justified if the subject's voluntary consent has been given. However, consent to a search amounts to a waiver of a constitutional right, and

"[w]aiver, in this context, means the 'intentional relinquishment of a known right or privilege'. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Such a waiver cannot be conclusively presumed from a verbal expression of assent. The court must determine from all the circumstances whether the verbal assent reflected an understanding, uncoerced, and unequivocal election to grant the office[r] a license which the person knows may be freely and effectively withheld. . . ." Cipres v. United States, 343 F.2d 95, 97 (9th Cir. 1965).

To meet constitutional requirements,

"the consent must be proved, by clear and positive evidence, to be voluntary, unequivocal, specific and intelligently given rather than resulting from duress or coercion, whether actual or implied. United States v. Como, 340 F. 2d 891, 893 (2d Cir. 1965); United States v. Smith, 308 F.2d 657, 663 (2d Cir. 1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963)."

* There may be other circumstances, not here relevant, in which a law enforcement officer may constitutionally make a search without a warrant. Such circumstances may include: (1) the search of a moving vehicle, in the presence of "substantial ground" to believe a crime is being committed, Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); (2) the search of a vehicle which has been impounded pursuant to statute pending forfeiture proceedings, where the search is closely related to the reason for the arrest, Cooper v. California, 386 U.S. 58, 87 S.Ct.

788, 17 L.Ed.2d 730 (1967); (3) the search of a house for persons and weapons, where "the exigencies of the situation" require a speedy search to apprehend a suspected armed felon who was observed entering the house, Warden v. Hayden, 387 U.S. 294, 298–300, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); and, possibly, (4) electronic surveillance authorized by the Attorney General in cases involving foreign espionage, *see* United States v. United States District Court, 407 U.S. 297, 321–322, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); United States v. Smith, 321 F.Supp. 424, 426 (C.D. Cal. 1971).

United States v. Bell, 335 F.Supp. 797, 803 (E.D.N.Y. 1971).

*See also* 8A J. Moore, Federal Practice ¶ 41.07[4], at 41–79.

■■ It is clear that in the instant case, the defendant did not give consent to a search of his suitcase. He opened it only after he was ordered to do so by the marshal at a time when he was not free to leave or to avoid the search. Under such circumstances, the search was inherently coercive. Cipres v. United States, *supra,* 343 F.2d at 98; United States v. Page, 302 F.2d 81, 83–84 (9th Cir. 1962). The defendant's conduct "hardly amounts to an 'unequivocal, specific, and intelligently given' consent." *Lopez, supra,* 328 F.Supp. at 1093; *see Bell, supra,* 335 F.Supp. at 803. The government argues that the presence of signs in the boarding area indicating that passengers and baggage were subject to search amounts to implied consent. This contention, however, must clearly fail, both because such consent does not meet the constitutional standards set forth in *Cipres, supra,* and because "the government [cannot] condition the exercise of the defendant's constitutional right to travel on the voluntary relinquishment of his Fourth Amendment rights." *Lopez, supra,* 328 F.Supp. at 1092–1093; Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

#### Limited Search for Weapons

■ Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968), Sibron v. New York, *supra,* and Adams v. Williams, *supra,* establish that there are circumstances in which a law enforcement officer may constitutionally search a suspect in the absence of probable cause for arrest or of consent:

> "[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry, supra,* 392 U.S. at 22, 88 S.Ct. at 1880.

These circumstances, however, and the scope of the resulting permissible search, are both severely limited. The test as to whether the search is allowable is the reasonableness in light of Fourth Amendment principles of "the particular governmental invasion of a citizen's personal security." *Terry, supra,* at 19, 88 S.Ct. at 1878; *Chimel, supra,* 395 U.S. at 765, 89 S.Ct. 2034. The limitations are that (1) the search is permissible only if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. . . . [because the suspect] was armed and dangerous," *Terry, supra,* 392 U.S. at 27, 30, 88 S.Ct. at 1883, 1884; and (2) the search must be related in "nature and scope" to the justification for it and must initially consist of a "limited exploration for arms," *Sibron, supra,* 392 U.S. at 65, 88 S.Ct. 1889.

Several courts have recently applied the *Terry* and *Sibron* standards to airport search situations with respect to: (A) the hijacker profile; (B) the search by magnetometer; and (C) the physical search of the subject's person, clothing, or luggage.

#### A.  *The Profile*

The FAA hijacker profile was developed as a device to pinpoint those ticket holders who are most likely to be hijackers, while eliminating the necessity for most passengers to undergo physical searches. The use of the profile was upheld in *Slocum, supra,* 464 F.2d at 1183, and in *Lopez, supra,* 328 F.Supp. at 1086–1087. Under established procedures, passengers are not to be searched unless they (1) meet the profile, (2) activate the magnetometer, and (3) fail to provide satisfactory identification. *See Lopez, supra,* at 1083.

#### B.  *Search by Magnetometer*

The use of a magnetometer to detect metal at airport boarding gates was upheld in *Epperson, supra,* and *Slocum, supra.* The *Epperson* court stated that

> "the search for the sole purpose of discovering weapons and preventing

air piracy, and not for the purpose of discovering weapons and pre-criminal events, fully justified the minimal invasion of personal privacy by magnetometer. The use of the device, unlike frisking, cannot possibly be 'an annoying, frightening, and perhaps humiliating experience,' *Terry, supra* at 25, 88 S.Ct. at 1882 . . . ." 454 F.2d at 771.

The court found "an overwhelming governmental interest" in protecting airline passengers from hijackings, and found that this interest justified the routine subjecting of passengers to magnetometer searches. It should be noted, however, that about 50% of the passengers who pass by the magnetometer activate it, and that an object as small as a nail file will trigger it. *Lopez, supra,* 328 F.Supp. at 1086; *Bell, supra,* 335 F. Supp. at 802; Note, Airport Security Searches and the Fourth Amendment, 71 Colum. L. Rev. 1039, 1040 (1971).

### C. *Physical Search of Person, Clothing or Luggage*

*Terry* and *Sibron* established a limited justification for a warrantless search "in appropriate circumstances." The search must "be strictly circumscribed by the exigencies which justify its initiation," and "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry, supra,* 392 U.S. at 26, 29, 88 S.Ct. at 1882, 1884; *see* Tinney v. Wilson, 408 F.2d 912, 916 (9th Cir. 1969).

The search of the defendant's suitcase in the instant case was impermissible under the Fourth Amendment for two separate and distinct reasons: (1) the defendant was not told at the time the search was initiated that he had a right to refuse to submit to the search provided he did not board the plane; and (2) the search was not sufficiently limited in scope, as required by *Terry* and *Sibron.*

### 1. *Right to Decline Search*

The search of either the defendant's person or of his suitcase was constitutionally impermissible because the defendant was not given the opportunity to decline to submit to the search upon the condition that he not board the plane.

The governmental interest which justifies the physical search of the defendant's person or carry-on luggage is to prevent "armed piracy of a passenger aircraft in flight," and the justification for the search arises from "the reasonable fear of the marshal for the safety of airline passengers [entitling him], for their protection, to conduct a carefully limited search . . . in an attempt to discover weapons which might be used for air piracy." *Epperson, supra,* 454 F.2d at 772. The class of persons with respect to which the governmental interest in preventing air hijackings extends consists of the passengers and crew on the airplane. As the *Epperson* court noted in applying *Terry* to delineate the class of persons protected by this governmental interest:

> "The rationale of *Terry* is not limited to protection of the investigating officer, but extends to 'others . . . in danger.' *Terry, supra,* 392 U.S. at [27], 88 S.Ct. 1868, 20 L.Ed.2d 889. That all *passengers* are endangered by the presence of weapons *on aircraft* needs no exposition." 454 F.2d at 772. (Emphasis added.)

If the defendant in this case was not in fact going to board the plane—and he testified that he would not have attempted to board had he been given the opportunity to decline to undergo the search—he would pose no danger to the passengers and crew on the aircraft. Accordingly, the governmental interest which justifies a physical search of the person or hand luggage of a prospective passenger in the process of boarding an airliner is lacking in the case in which the prospective passenger declines to board the plane. To meet Fourth

Amendment guarantees, the prospective passenger must be advised that he has to submit to a search if he wants to board the plane, but that he can decline to be searched if he chooses not to board the aircraft.

The Fourth Amendment rights of a prospective passenger who chooses not to board an airliner should be coextensive with those of anyone else in the air terminal. The mere fact of meeting the profile and activating the magnetometer does not establish grounds for a forced search. The subject who declines to board the plane can, like anyone else in the air terminal, be monitored by marshals and airline personnel. If he acts in a manner which would make him liable to search under the usual search standards, he can then be searched. But to require submission to a forced search under the facts presented here would establish a unique Fourth Amendment standard for prospective passengers at airline boarding gates. While there is a governmental interest justifying a search in the case of passengers who actually board the plane, there is no such interest with respect to persons who merely appear at the boarding gate and choose not to board, and accordingly a physical search of one's person or luggage is held to be impermissible under those circumstances.

The court's holding is consistent with airline and FAA approved procedures. On most airlines,

> "[i]f the magnetometer indicates that a passenger . . . carries an amount of metal equivalent to a dangerous weapon, he is invited out of line and courteously interviewed by a ticket agent. If the interview is satisfactory the passenger moves on to the aircraft. But if he is uncooperative, or the ticket agent has reason to consider him a security risk, he is denied passage on the aircraft." Note, Airport Security Searches and the Fourth Amendment, *supra*, 71 Colum. L. Rev. at 1040.

Under FAA approved procedures, if a Deputy United States Marshal is summoned and the passenger, after meeting the profile and activating the magnetometer, fails to produce satisfactory identification, "a request is made that he submit to a 'voluntary' search." *Lopez, supra*, 328 F.Supp. at 1083.

The government argues that the search is permissible under Adams v. Williams, *supra*. But *Adams* is readily distinguishable from the instant case. In *Adams*, a patrolman in a high-crime area was told by an informant known to him that the defendant, seated in a nearby automobile, was carrying narcotics and had a gun at his waist. The officer approached the car and asked the occupant to open the door. The defendant responded by rolling down the window. The officer then reached into the car and removed a loaded revolver from the defendant's waistband, just where the informant had said it would be. The Court held that the search was permissible under *Terry*, but emphasized three factors that are lacking in the instant case: (1) the proven credibility of the informant, (2) the danger to the officer, and (3) the defendant's actions after he was approached by the officer. The Court stated that:

> "[W]e believe that Sgt. Connolly acted justifiably in responding to his informant's tip. The informant was known to him personally and had provided him with information in the past. This is a stronger case than obtains in the case of an anonymous telephone tip. The informant had come forward personally to give information that was immediately verifiable at the scene. Indeed, under Connecticut law, the informant might have been subject to immediate arrest for making a false complaint . . . . Thus, . . . the information carried enough indicia of reliability to justify the officer's forcible stop of Williams.

\*     \*     \*     \*     \*     \*

"While properly investigating the activity of a person who was reported to be carrying narcotics and a concealed weapon and who was sitting alone in a car in a high-crime area at 2:15 in the morning, Sgt. Connolly had ample reason to fear for his safety. When Williams rolled down his window, rather than complying with the policeman's request to step out of the car so that his movements could more easily be seen, the revolver allegedly at Williams' waist became an even greater threat. Under these circumstances the policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety, and we conclude that it was reasonable. . . ." 407 U.S. at 146–148, 92 S.Ct. at 1923.

Thus, the elements which were crucial to the Court's holding in *Adams*, especially the presence of a tip from a reliable informer, are lacking in the instant case.

2. *Scope of the Search*

While this decision is based on the fact that the defendant was not given an opportunity to decline to submit to the search if he chose not to board the plane, there is a second, independent ground for holding that the search violated the defendant's Fourth Amendment rights: the search was not sufficiently limited in scope, as required by *Terry* and *Sibron*.

In *Sibron*, a police officer observed the defendant talking with known narcotics addicts over an eight-hour period and then searched his pocket, discovering heroin. Distinguishing *Sibron* from *Terry*, the Court stated that

"Even assuming *arguendo* that there were adequate grounds to search Sibron for weapons, the nature and scope of the search conducted by Patrolman Martin were so clearly unrelated to that justification as to render the heroin inadmissible. The search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault. Only when he discovered such objects did the officer in *Terry* place his hands in the pockets of the men he searched. In this case, with no attempt at an initial limited exploration for arms, Patrolman Martin thrust his hand into Sibron's pocket and took from him envelopes of heroin. . . ." 392 U.S. at 65, 88 S.Ct. at 1904.

In the reported federal cases which have upheld airport searches following positive magnetometer readings, the scope of the search was initially restricted to "a limited patting of the outer clothing of the suspect for concealed [weapons]." The scope of the search was not restricted in this manner in the instant case.

In *Epperson, supra,* the court upheld a search which revealed a gun in the jacket that the defendant was carrying. The decision was quite narrow, however, in defining the permissible scope of a search subsequent to a positive magnetometer reading:

"When the high metal indication of the magnetometer was not satisfactorily explained by Epperson, the subsequent physical 'frisk' of his jacket was entirely justifiable and reasonable under *Terry*. At this stage . . . the reasonable fear of the marshal for the safety of airline passengers increased and he was entitled, for their protection, to conduct *a carefully limited search of the clothing* of Epperson in an attempt to discover weapons which might be used for air piracy. . . ." 454 F.2d at 772. (Emphasis added.)

The court in United States v. Lindsey, 451 F.2d 701, 704 (3rd Cir. 1971), concluded that

"[t]he use of four different names, defendant's extremely anxious behavior and the very hard bulge in the coat pocket provided a sufficient basis, in the context of an airline boarding, to stop defendant and conduct *a*

*limited pat down."* (Emphasis added.)

In *Bell, supra,* a deputy marshal conducted a pat-down of the defendant's exterior clothing and felt two hard bulges, which turned out to be narcotics. The court found that the limited pat-down search conformed to the *Terry* requirements and held that the narcotics was admissible. And in *Lopez, supra,* the court ruled that narcotics which the marshal felt as a hard object under the defendant's outer clothing in the course of a pat-down search was admissible under *Terry,* but granted the defendant's motion to suppress on other grounds.

The only case called to the court's attention in which the defendant's carry-on luggage was searched, as here, is *Slocum, supra.* In that case, the marshal requested identification after the defendant had activated the magnetometer, but the defendant could produce none. The court concluded that the subsequent search of the defendant's luggage was proper, but noted that "[i]t was only after the frisk failed to disclose anything which might have triggered the magnetometer that the Marshal requested that defendant open his luggage." 464 F.2d at 1183.

In the instant case, no evidence was adduced to show that the marshal made an "attempt at an initial limited exploration for arms," as required by *Terry* and *Sibron.* The evidence shows only that, subsequent to defendant's activating the magnetometer, the marshal demanded that he open his suitcase for a search. The marshal did not initially perform a pat-down of the defendant's outer clothing, or even ask him to produce identification, which is a required step under the FAA approved procedures in airport search situations. *See Lopez, supra,* 328 F.Supp. at 1083.

This court holds, independent of the other ground for decision, that the failure of the marshal to make an initial pat-down of the defendant's outer clothing before searching his suitcase prevents the search from coming within the *Terry* penumbra and makes it violative of the Fourth Amendment. A limited pat-down search which reveals the metal object responsible for the positive magnetometer reading obviates the necessity for a search of the suitcase. *Cf. Slocum, supra,* 464 F.2d at 1184. Under the Fourth Amendment, the marshal does not have a blank check to search anything in the suspect's possession, and may not search the suitcase without an initial pat-down search for weapons that falls within *Terry. See* Tinney v. Wilson, *supra;* United States v. Hostetter, 295 F.Supp. 1312 (D. Del. 1969).

The evidence sought to be introduced by the prosecution was obtained in violation of the Fourth Amendment, and the motion to suppress the evidence is granted.

