**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gerald Eugene DISHMAN, Defendant-
Appellant.**

**No. 72–2087.**

United States Court of Appeals,
Ninth Circuit.

Sept. 21, 1973.

Rehearing Denied Dec. 5, 1973.

Martin Levine, Deputy Federal Public Defender (argued), Los Angeles, Cal., for defendant-appellant.

David Fox, Asst. U. S. Atty. (argued), William D. Keller, U. S. Atty., Eric A. Nobles, William John Rathje, Asst. U. S. Attys., Los Angeles, Cal., for plaintiff-appellee.

Before WRIGHT and WALLACE, Circuit Judges, and EAST, District Judge.*

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

## OPINION

EAST, District Judge:

### STATEMENT OF PROCEEDINGS

The defendant-appellant Gerald Eugene Dishman (Dishman) was charged under a United States Attorney's Information of the crime of "attempting to board . . . an aircraft . . ., then and there having on or about his person a .22 caliber starter pistol, a concealed, deadly and dangerous weapon," in violation of Title 49 U.S.C. Section 1472(*l*).[1]

Dishman was convicted and sentenced after a trial to the court. He appeals, asserting a claim of unlawful search and seizure, and further, that the District Court erred in finding that the charged starter pistol constituted a "deadly and dangerous" weapon within the meaning and proscription of the subsection (*l*).[2]

### Facts

On January 27, 1972, Dishman arrived at the boarding gate for Western Airlines Flight 560, a regularly scheduled flight from Los Angeles International Airport to Salt Lake City, Utah. He presented his ticket, received a boarding pass and joined, at the end, the line of passengers being processed through the active field of the magnetic metal detecting device then in service. On two successive passthroughs by Dishman a high reading of the presence of metal was signaled. When confronted by the Marshal in charge, Dishman first denied he was carrying any metal object and then retrieved from his jacket pocket and handed to the Marshal the charged object, saying, "Here, I forgot I was carrying this." The Marshal testified, "I took the gun from the defendant. I informed him he was under arrest for carrying a weapon upon boarding an aircraft." "It is a 22 caliber blank pistol, starter pistol, as we refer to it." "The weapon has a cylinder with a bore approximately 22-thousandths or 22 caliber, I'd say, with eight bores in the cylinder which would allow it to carry eight 22-caliber blanks. The cylinder rotates just as any normal revolver would. By cocking the hammer you would rotate the cylinder, placing a live *blank* directly under the firing pin. The weapon does have a fixed firing pin." In answer to the question, "Is that weapon, *as it is presently made*, capable of firing a projectile," the Marshal responded, "Not in that state, no sir!" Later, "The only danger would be if the weapon was held close enough to an individual you could probably receive powder burns." Other testimony established that the intended use and purpose of the starter pistol was a blank cartridge firing pistol making a loud pop, similar to a toy cap pistol upon being fired. The barrel was solidly plugged near the end and the cylinder cartridge retaining holes or bores were half filled with metal and incapable of receiving and holding cartridges. The Marshal, when asked to describe briefly how the "weapon" could be "made capable of firing a projectile," replied, "You would take the cylinder and the bores that are already in the cylinder that are at the present time half open, if you bored those out with a drill to where they would be the full bore and then cut the barrel off at the end of the frame, the weapon could be used to fire 22-caliber ammunition bullets, projectiles."

### Construction of the Statute

We acknowledge that the subsection (*l*) together with its companion subsections (proscribing crimes aboard the airplane) are geared and aimed at controlling and containing the ever growing peril and threat to the safety of the

---

1. The pertinent portions of subsection (*l*) "except . . . officers . . . whoever attempts to board . . . an aircraft while having on or about his person a concealed deadly or dangerous weapon, shall be fined, etc."

2. The District Court stated in its oral findings: "I also feel that the starter pistol in the context of boarding an aircraft is a dangerous weapon."

lives and property of the traveling public. Further that the congressional purpose behind the subsection, as with all statutes proscribing the carrying of concealed "deadly and dangerous" weapons generally, is to avoid ready availability of a "deadly and dangerous" weapon for use in the perpetration of a crime aboard an aircraft. 94 C.J.S. Weapons § 2(f), page 479; House Rep. § 958, 2 U.S.Code Cong. & Admin.News 1961, 2563. Nevertheless, the section is a criminal statute proscribing definite and certain conduct, i. e., the carrying of a concealed "deadly and dangerous" weapon when boarding an aircraft, no more and no less.[3]

■ Congress did not attempt to define the terms "deadly or dangerous" weapon, finding this not feasible, practical or necessary and leaving it to the court to determine in each case, on an *ad hoc* basis, *whether the weapon was deadly or dangerous.* House Rep. cited, 2 U.S.Code Cong. & Admin.News 1961, at 2570 and 2575. Accordingly, then in the process of measuring and fitting the facts of this case to the language of the subsection (*l*) within itself we are obliged to and must be guided by the statutory construction truism that "a criminal statute proscribing an act must be strictly construed against the prosecution and liberally in favor of the accused." United States v. Resnick, 299 U.S. 207, 57 S.Ct. 126, 81 L.Ed. 127 (1936); Ornelas v. United States, 236 F.2d 392 (9th Cir. 1956).

### Discussion

■ The material elements of the charged offense are:

1) an attempt on the part of a person to board an aircraft; and

2) then having on his person a concealed "deadly and dangerous weapon.

Any necessary element of present or later developed intent to make use of the "deadly and dangerous" weapon in the commission of a crime while aboard the aircraft is conspicuous by its utter absence.

■ It is readily manifest that the proscribed weapon must be one that is a "deadly and dangerous" weapon per se or inherently so through its construction:

"  .  .  . a dangerous or deadly weapon is one which in *its* intended or readily adaptable use is likely to produce death or serious bodily injury." 94 C.J.S. Weapons, § 6(c), page 489; Generally speaking, "[a] deadly weapon is one likely to produce death or great bodily injury." The character of an implement as a deadly weapon is determined by *its capacity* to inflict death or injury, and a toy, or a chocolate candy pistol has no ability to commit a violent or any injury on the person of another, unless used as a club. See People v. Vaiza, 244 Cal. App.2d 121, 52 Cal.Rptr. 733 (1966).

A review of the authorities in this circuit pinpoints the clear distinction the law makes between objects that are "deadly and dangerous" weapons per se and other objects that by reason of their use become "deadly and dangerous" weapons.

Per Se Rationale:

In Price v. United States, 156 F. 950 (9th Cir. 1907), the statute under consideration forbade an assault upon another with a dangerous weapon. The defendant pointed an unloaded pistol in a threatening manner at another. The court held the act was certainly an assault but the conviction of the defendant of assault with a *dangerous weapon* cannot be sustained.

"In order to constitute that offense, a dangerous weapon must be used in making the assault. The use of a dangerous weapon is what distinguishes the crime of an assault with a dangerous weapon from a simple as-

---

3. The crime, if any, is committed by that conduct with or without intent as to subsequent use of the "deadly and dangerous" weapon while aboard the airplane. Any unlawful use of the "deadly and dangerous" weapon while aboard the aircraft is proscribed by other subsections of the statute.

sault. A dangerous weapon "is one likely to produce death or great bodily injury.' U. S. v. Williams (C.C.) 2 F. [61] 64."

"If the defendant had struck or attempted to strike with it, the question whether it was or was not a dangerous weapon in the manner used, or attempted to be used, would be one of fact; but the courts quite uniformly hold as a matter of law that an unloaded pistol, when there is no attempt to use it otherwise than by pointing it in a threatening manner at another, is not a dangerous weapon."

*Price* in its context has been followed consistently as late as United States v. Davis, 429 F.2d 552 at 555 (8th Cir. 1970), and is in conformity with the general rule. Witkin, California Crimes, § 267, at 252 (1963).

Use Rationale:

In this category fall Wagner v. United States, 264 F.2d 524 (9th Cir. 1959) (Post Office robbery statute containing an escalator clause for those putting lives in jeopardy *"by the use of* a dangerous weapon or device,"; charged object: hand gun inferred to be loaded); Evalt v. United States, 382 F.2d 424 (9th Cir. 1967) (Bank robbery statute containing an escalator clause for those putting lives in jeopardy "by the use of a dangerous weapon or device,"; charged object: an unloaded gun); United States v. DePalma, 414 F.2d 394 (9th Cir. 1969) (Bank robbery statute containing an escalator clause for those putting lives in jeopardy "by the use of a dangerous weapon or device,"; charged object: an unloaded gun). In each of these cases the court applied a *standard of use* to the objects charged emphasizing the propensity of the charged object to cause: a. bodily injury when used as a club or bludgeon; and b. the victim to reasonably infer that the pistol is ready to fire and placed in object fear of harm and submission. It is *with such use* by a person and only then that the inert object becomes a "deadly and dangerous" weapon.

It is of interest to note that in none of the cases was *Price* distinguished or otherwise alluded to. We suggest that the reason for this was not an oversight of an early decision, but an acknowledgment that *Price* was dealing with a charged inert object, as it must under the statute, in the context of its own inherent "capacity to inflict death or injury." While *Wagner,* and the other use rationale cases, were dealing with a charged inert object, as they must under their respective statutes, in the context of the actual *factual use* of the object in the hands of another as a weapon to cause death or serious bodily injury or to place a reasonable person in object fear of such and induce submission.

The government relies heavily upon United States v. Cook, 446 F.2d 50 (9th Cir. 1971); United States v. Ware, 315 F.Supp. 1333 (W.D. Okl.1970); Jackson v. State, 231 M.D. 591, 191 A.2d 432 (Md.1963); and United States v. Bissett, Cr., 71–139–J (D.Mass. April 22, 1971), all of which, except *Jackson,* involve the boarding of an airplane while carrying an unloaded pistol. *Jackson* involves a robbery with a deadly weapon statute with the use of a .22 caliber starter pistol. *Cook* falls in the per se rationale category. *Ware* and *Jackson* fall in the use rationale category. *Bissett,* although similar in fact as presented here, is of no weight or help whatsoever in the solution of our query. A plea of guilty was entered by the defendant.

The entire opinion in *Cook* reads as follows:

"The judgment of conviction is affirmed. Cook carried a concealed but empty .38 calibre [sic] pistol into the jetway connected to an Eastern Airlines plane at Los Angeles where he was stopped.

"For the purposes of 48 U.S.C. § 1472(1) we hold that the empty gun was a dangerous weapon."

Since *Cook* does not allude to *Price,* we assume the facts there present distinguished the "empty .38 calibre [sic] pis-

tol" from the unloaded pistol in *Price*. It appears that *Cook* extends the rule of per se definition in *Price* to include a "deadly and dangerous" weapon as one readily made likely "to produce death or great bodily injury." For example: a flip of the hand can insert a live cartridge into an empty .38 caliber pistol.

■ However, under the facts here the starter pistol carried by Dishman was an inert object, neither *its* intended use nor readily adaptable use was likely or readily made likely to produce death or great bodily harm. It would take a machinist considerable time with metal cutting drill and saw to convert it into any semblance of an operating weapon likely to produce death or great bodily harm.

The plain language of subsection (*l*) proscribes the carrying of "deadly and dangerous" weapons and we hold that Dishman's starter pistol as a matter of law is just not a "deadly and dangerous" weapon per se.

■ Subsection (*l*) is a non-intent statute, a starter pistol is in no different position than a toy gun or candy gun or pair of scissors. Of course, the situation would be different if use were made of a starter pistol on an airplane to perpetrate a skyjacking. In that situation, one is in the same position that a bank robber is when he uses a decoy gun, and the *factual use* rationale would apply.

■■ We cannot read into the language of the subsection a proscription of the carrying of any object which has the capacity to be used in the furtherance of a crime aboard an aircraft.[4] Congress

did not exercise its power to forbid the carrying of such objects aboard airplanes and for us to supply such language to the subsection would not be a judicial construction of the statute but on the contrary a judicial legislation of an ex post facto criminal law and we decline to do so.

*Ware* and *Jackson* do just that. They use a rationale of probable or possible uses of the charged object and then transfer to the unloaded pistol the actual *factual use* definition of a deadly and dangerous weapon, and we decline to follow.

It is unnecessary for us to deal with Dishman's claim of invalid search and seizure.

The judgment of conviction and sentence is reversed and the cause remanded to the District Court for further proceedings.

Reversed and remanded.

WRIGHT, Circuit Judge (dissenting):

Respectfully, I disagree and would affirm the judgment of conviction.

The statute in question was intended to prevent passengers from carrying aboard aircraft those weapons or facsimilies which could readily be used in acts of air piracy. The starter gun used here is just such an article. I would hold that it falls within the meaning of "deadly and dangerous weapon", as that term is used in the statute.

I am unable to distinguish this from the weapon used in United States v. Cook, 446 F.2d 50 (9th Cir. 1971), discussed in the majority opinion.

I would affirm.

4. Examples: A starter pistol, toy or candy pistol useable as a lookalike real thing; a razor useable as a knife; a businessman's letter opener useable as a dagger; a fountain pen useable to assimilate a pistol in the course of a robbery.