**UNITED STATES, Appellee,**

v.

**Ernest Jay HARRIS, Appellant.**

**Misc. Docket No. N–73–445.**

United States District Court,
E. D. Pennsylvania.

Sept. 26, 1974.

Gilbert J. Scutti, Asst. U. S. Atty., Philadelphia, Pa., for appellee.

George Gershenfeld, Philadelphia, Pa., for appellant.

## OPINION

DITTER, District Judge.

In this case the defendant was convicted by a United States Magistrate[1] of attempting to carry a concealed weapon aboard a commercial aircraft.[2] He appeals[3] on the grounds that he was not given Miranda warnings and there was no showing that he intended to violate the statute. I affirm.

Ernest Jay Harris was arrested at Philadelphia International Airport on September 25, 1973, while attempting to board a Delta Air Lines flight for Montgomery, Alabama. While passing through a passenger boarding area, Harris placed a piece of hand luggage upon a conveyor belt which transported it through an x-ray scanning device. On the x-ray screen, an airport inspector, Tony Mastricola, spotted a handgun inside the bag. He in turn notified Diane Burton, an agent of a private security company working for the airport. She

---

1. He was tried pursuant to 18 U.S.C. § 3401(a), which states:

   When specially designated to exercise such jurisdiction by the district court or courts he serves, and under such conditions as may be imposed by the terms of the special designation, any United States magistrate shall have jurisdiction to try persons accused of, and sentence persons convicted of, minor offenses committed within that judicial district.

2. 49 U.S.C. § 1472(l) provides in part: "whoever, while aboard an aircraft being operated by an air carrier in air transportation, has on or about his person a concealed deadly or dangerous weapon, or whoever attempts to board such an aircraft while having on or about his person a concealed deadly or dangerous weapon, shall be fined not more than $1,000 or imprisoned not more than one year, or both."

3. In all cases of conviction by a United States magistrate an appeal of right shall lie from the judgment of the magistrate to a judge of the district court of the district in which the offense was committed. 18 U.S.C. § 3402.

also observed the pistol, and thereupon opened the bag and between two pairs of trousers discovered the weapon, a loaded .22 caliber Derringer. Harris stated that his younger son, Stephen, had packed the suitcase and that he was unaware that it contained a gun. Donald Istak, a Philadelphia police officer assigned to a screening detail at the airport, came to the scene and questioned Harris about his destination and whether he possessed a license for the firearm. Having seen a plane ticket in Harris' hand, Officer Istak removed him to an office in the airport where he was interrogated by Detective George Hatton, also a member of the Philadelphia police force. Again he denied any knowledge that the bag contained a gun. Neither of the police officers advised appellant of his Miranda rights. Thereafter he was turned over to agents of the Federal Bureau of Investigation who advised him of his rights and interrogated him. He maintained that he had no knowledge of the pistol's presence in the suitcase.

At trial, which was conducted by the Honorable Edwin E. Naythons, United States Magistrate, appellant testified that although the pistol was not his, he had discovered it in his home some months prior to his arrest and concealed it in the basement. He explained that his older son, Reuben, recently had been involved in a number of gang shootings, and was in fact incarcerated as a juvenile delinquent. Appellant and his younger son, Stephen, both stated that it was Reuben's trousers which were packed in the suitcase because none of appellant's were available. Stephen said that he took out his brother's pants and placed them on a bed, from which they were simply lifted into the suitcase. Appellant and his son also testified that the airport security officer found the gun inside a pocket of one of Reuben's pairs of trousers, rather than between two pairs as the officer claimed. Harris admitted he had previously been convicted of aggravated assault and battery with intent to murder two persons by

shooting, and introduced the prior conviction as an exhibit as part of his defense. Judge Naythons found Harris guilty on November 30, 1973, and placed him on probation. This appeal followed.

Appellant urges reversal of his conviction on three grounds: (1) his statement to the first officer, Istak, should have been excluded because of the officer's failure to give appellant the Miranda warnings; (2) his statements made to the FBI agents should be excluded, notwithstanding the fact that he was given Miranda warnings, because that interrogation was impermissibly tainted by the questioning of Detective Hatton in the office at the airport, the latter conversation having been suppressed by Judge Naythons; and (3) 42 U.S.C. § 1472(*l*) requires knowledge on the part of the accused of the presence of a concealed deadly or dangerous weapon, knowledge which appellant here lacked. After a careful review of the record, I am persuaded that appellant's arguments all are without merit.

■ Sitting as I am in this instance, as a single-judge court of appeals, I am obliged to accept the findings of fact of the Magistrate unless such findings are clearly erroneous. Taylor v. United States, 358 F.Supp. 384, 385 (S.D.Fla. 1973); United States v. Margraf, 347 F.Supp. 230, 232 (E.D.Pa.1972).

■ Appellant's first contention— that Officer Istak should have advised him of his Miranda rights before asking if he possessed a license for the firearm in his suitcase and whether he was a ticketed passenger—flies in the face of both case law and the inherent practicalities of such a situation. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), established the doctrine that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination," 384 U.S. at 444, 86 S.Ct. at 1612, and set out a spe-

cific set of protective guidelines to effectuate that principle.[4] The Court hastened to add, however, that:

> Our decision is not intended to hamper the traditional function of police officers in investigating crime. See Escobedo v. State of Illinois, 378 U.S. 478, 492, 84 S.Ct. 1758, 1765, 12 L. Ed.2d 977 . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.

384 U.S. at 477, 86 S.Ct. at 1629.

What constitutes a custodial interrogation within the meaning of Miranda must, of course, be approached on a case-by-case basis. United States v. Clark, 425 F.2d 827, 832 (3d Cir. 1970), cert. denied, 400 U.S. 820, 91 S.Ct. 38, 27 L.Ed.2d 48. In making this determination, the United States Court of Appeals for the District of Columbia Circuit reminds us that:

> The police talk to too many people in the course of a day to make warnings compulsory every time they inquire into a situation. Such a requirement would hamper and perhaps demean routine police investigation.

James v. United States, 135 U.S.App.D. C. 314, 418 F.2d 1150, 1152 (1969); Allen v. United States, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968), supp. op., 131 U.S.App.D.C. 358, 404 F.2d 1335. Bearing in mind such fundamental considerations, the federal judiciary has found the application of the general investigation/custodial interrogation dichotomy, if not without occasional difficulty, at least a practical approach.

A number of cases are instructive on the issue of whether Officer Istak was required to advise appellant of his Miranda rights prior to their initial conversation at the x-ray checkpoint. In Utsler v. Erickson, 440 F.2d 140 (8th Cir. 1971), cert. denied, 404 U.S. 956, 92 S.Ct. 319, 30 L.Ed.2d 272, for example, law enforcement officers were alerted that a suspect in a Sioux Falls, South Dakota, robbery might be driving a white automobile with California license plates. Such a vehicle, driven by defendant, was stopped near Madison, South Dakota, and a police officer asked him if he had been in Sioux Falls. Defendant responded that he had just gone around the outskirts of Sioux Falls, a statement he denied making at trial and which he sought to suppress for failure to be advised of his Miranda rights. Deciding that the statement was properly admitted, the court held that in investigating a probable offense, police may ask preliminary questions concerning identification and the recent whereabouts of persons under suspicion in order to proceed with the investigation and to eliminate quickly those who appear to be beyond suspicion, and that such questioning does not necessitate recitation of the Miranda warnings. A similar position was adopted in United States v. Gibson, 392 F.2d 373 (4th Cir. 1968). There police received an anonymous tip that the automobile being driven by defendant was stolen. A police officer located him inside a tavern and asked him to step outside. In response to questioning, defendant admitted that the vehicle was his and produced an apparently altered registration card. The court held that the atmosphere surrounding the questioning of the defendant could not be characterized as coercive, and that statements freely made by him and the registration card were properly admitted even in the absence of Miranda warnings. In United States v. Charpentier, 438 F.2d 721 (10th Cir. 1971), it was held that where a stolen automobile was discovered in a parking lot, a police officer who found the defendant in a nearby building was not obliged to give him Miranda warnings before ascertaining whether he was con-

---

4. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement that he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

nected with the stolen vehicle and placing him under arrest. And in United States v. Sadler, 458 F.2d 906 (10th Cir. 1972), where the fact that a crime had been committed had not yet been established when a patrolman stopped an automobile in which the defendant was a passenger, the court held that the defendant was not then entitled to be advised of his Constitutional rights.

Moreover, as was noted by the Magistrate, it is significant that the disputed interrogation occurred in a context which might best be characterized as "regulatory deterrence." As the Second Circuit has recognized:

> Airplane hijacking is a particularly frightening crime. Many hijackers have been psychotic or political fanatics, for whom death holds no fear and little consequence, willing to bargain with the lives of defenseless passengers for money, transportation to a safe haven, the release of "political" prisoners, or some otherwise unattainable demand . . . The present antihijacking system did not spring full blown into life. "Profiles" and selective investigation came first; plain clothes sky marshalls became regular forward seat passengers . . . Finally, technology with magnetometers, metal detection devices and X-rays was brought to bear.

United States v. Albarado, 495 F.2d 799, 803 (2d Cir. 1974).[5]

Indeed, our own Court of Appeals arguably approved the procedure complained of here in United States v. Slocum, 464 F.2d 1180 (3d Cir. 1972). There the court held that when the defendant's characteristics conformed to the Federal Aviation Administration's Anti-Air Hijack Profile, a positive reading was recorded when he passed through a magnetometer, he could produce no identification for a marshall, and a frisk of his person failed to disclose anything which might have triggered the magnetometer, a warrantless search of his hand luggage was justified. Part of the procedure held Constitutional in *Slocum* involved requesting any passenger who conformed to the Profile to pause for questioning if a positive reading was noted on the magnetometer. 464 F.2d at 1182. This initial questioning was limited to identification and short inquiries concerning what in the passenger's possession might have triggered the magnetometer, *id.*, questions in my view no more intrusive or requiring potentially incriminating answers than those directed to appellant by Officer Istak.

▉ At least one Circuit has held that although searches of certain persons in the general airport area are to be tested under a case-by-case application of the reasonableness standard, those who actually present themselves for boarding an air carrier, like those seeking entrance into the country, are subject to a search based on mere or unsupported suspicion. United States v. Skipwith, 482 F.2d 1272, 1276 (5th Cir. 1973). While I express no opinion concerning the propriety of this standard, I find the analogy between airport searches and border searches not to be without merit, especially in a Fifth Amendment context. In United States v. Kurfess, 426 F.2d 1017 (7th Cir. 1970), cert. denied, 400 U.S. 830, 91 S.Ct. 60, 27 L. Ed.2d 60, it was held that Miranda warnings were not required prior to defendant's statement to customs agents pursuant to a routine border search, before his bags were opened and non-invoiced merchandise was discovered. Applying the guidelines to be gleaned from the foregoing cases to the present case I must agree with the Magistrate that Officer Istak was not obliged to advise appellant of his Miranda rights prior to asking him the few questions he did at the X-ray check point.[6]

---

5. *Judge Oakes' comprehensive opinion in Albarado* cogently traces "airport searches" and the crescendo volume of litigation arising therefrom, especially in the area of the Fourth Amendment.

6. In view of my disposition of this case it is unnecessary to reach the question of whether the statements made by appellant to Officer Istak would have to be suppressed had the brief interrogation at the X-ray check

As his second contention, appellant theorizes that his admission to the FBI agents of his intention to board the Delta airliner was sufficiently proximate to the earlier interrogation by Detective Hatton so as to have been tainted by it. He urges this statement therefore could not be received in evidence. I disagree.

During his conversation with Detective Hatton at the airport, appellant requested Hatton to advise appellant's family in Alabama that he would not be arriving as had been planned. As previously noted, the Magistrate correctly suppressed this statement because of Detective Hatton's failure to advise appellant of his Miranda rights.

■ Prior custodial interrogation does not automatically make inadmissible subsequent in-custody statements given during interrogation after appropriate warning. Westover v. United States, 384 U.S. 436, 495–496, 86 S.Ct. 1602, 1639, 16 L.Ed.2d 694 (1966); Harney v. United States, 407 F.2d 586, 589 (5th Cir. 1969). Rather, the facts and circumstances must be examined carefully to determine the existence and extent, if any, of a causal relationship between the earlier unconstitutional interrogation and the statement obtained in the later interrogation following Miranda warnings. Harney v. United States, supra at 589; United States v. Knight, 395 F.2d 971, 974 (2d Cir. 1968); Evans v. United States, 375 F.2d 355, 361 (8th Cir. 1967). The ultimate issue is whether the federal authorities were beneficiaries of pressure applied during the earlier, illegal custodial interrogation. Westover v. United States, supra, 384 U.S. at 497, 86 S.Ct. at 1639; United States v. Knight, supra 395 F.2d at 974. In Westover, supra, the Supreme Court relied largely on a test of proximity both in time and in place to

decide this issue. There the federal interrogation was conducted immediately following the unconstitutional questioning by state authorities in the same police station and under the same compelling circumstances as the state interrogation. The Court concluded that the federal authorities had indeed been the beneficiaries of the impermissible state conduct, but added:

We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them.

384 U.S. at 496, 86 S.Ct. at 1639.

■■ Fitting the instant case within these guidelines, I conclude, as did the Magistrate, that the questioning of appellant by the FBI was sufficiently removed both in time and place from the interrogation by Detective Hatton as to preclude the federal authorities from benefiting from the earlier questioning. Rather, the facts here seem to fit precisely the "different case" contemplated by the Supreme Court in Westover. Here, it appears from the record that after Detective Hatton's interrogation, the federal agent removed appellant from the airport to FBI headquarters, where he fully advised him of his rights before eliciting any statements from him. The record is devoid of any suggestion that the FBI agent coerced appellant into making a statement by reminding him of his earlier remarks or otherwise used these prior statements to

point been a custodial interrogation. Such statements have not been excluded in all contexts. See Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The Supreme Court held only last term that where the objective of the exclusionary rule, namely deterrence, will not be furthered, and

there is no indication of compulsion, evidence derived from statements obtained in violation of the Miranda rules will not necessarily be excluded. Michigan v. Tucker, 417 U.S. 433, 446–449, 94 S.Ct. 2357, 2365–2366, 41 L.Ed. 2d 182 (1974).

obtain admissions. Under these circumstances, the statements made by appellant were properly admitted.[7]

■ Appellant's final contention is that 49 U.S.C. § 1472(*l*) requires knowledge of the presence of a weapon on the part of the accused. The Magistrate found that appellant did have such knowledge,[8] a finding that should not be disturbed unless clearly erroneous. Taylor v. United States, supra at 385. Here the record contained ample evidence to support this conclusion. Moreover, as long as United States v. Margraf, 483 F.2d 708 (3d Cir. 1973), vacated and remanded on other grounds, 414 U. S. 1106, 94 S.Ct. 833, 38 L.Ed.2d 734, remains the law of this Circuit, knowledge plainly is not a requisite for a conviction under 49 U.S.C. § 1472(*l*).

Margraf was convicted of attempting to carry a pocket knife which had a three and one-quarter-inch-long blade aboard a commercial aircraft in violation of 49 U.S.C. § 1472. On appeal, the Court of Appeals, en banc, held that such a knife constituted a deadly or dangerous weapon within the meaning of the statute, and proof of intent to carry such weapon aboard an aircraft was unnecessary to secure a conviction. On certiorari, the Solicitor General recommended the case be remanded for dismissal of the complaint because the federal guidelines with respect to the definition of a firearm had not been met. The Supreme Court vacated and remanded the judgment, and on February 14, 1974, the Court of Appeals remanded the case to the District Court. In so doing, the appellate court noted that in his memorandum to the Supreme Court, the Solicitor General had stated:

> We do not, of course, concede that the decision of the court of appeals was wrong as a matter of law, or that the statute in question could never be applied to a knife such as petitioner's, or that there is any requirement of specific intent or *scienter*.

United States v. Margraf, 493 F.2d 1206 (3d Cir., filed Feb. 14, 1974), *quoting* Memorandum for the United States on Petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit, at 5, n. 5 (Nov., 1973). I am persuaded that the holding of *Margraf* with respect to specific intent survives the remand of that case, and absent the Magistrate's finding of knowledge, I would apply it to the present action.[9]

For the foregoing reasons the United States Magistrate's Order of Conviction of November 30, 1973, will be affirmed.

---

7. In any event, it is axiomatic that in a case tried to the court, without a jury, the admission of incompetent evidence does not render findings erroneous where, as here, there is substantial competent evidence to support them. Thompson v. Baltimore & O. R. Co., 155 F.2d 767, (8th Cir. 1946), cert. denied, 329 U.S. 762, 67 S.Ct. 122, 91 L.Ed. 657, and 329 U.S. 762, 67 S.Ct. 129, 91 L.Ed. 657; Bailey v. Sears, Roebuck & Co., 115 F.2d 904 (9th Cir. 1941), cert. denied, 314 U.S. 616, 62 S.Ct. 82, 86 L.Ed. 495; Anglo California Nat. Bank of San Francisco v. Lazard, 106 F.2d 693 (9th Cir. 1939), cert. denied, 308 U.S. 624, 60 S.Ct. 379, 84 L.Ed. 521 (1940).

8. In so finding, Judge Naythons, explicitly rejected appellant's testimony as "neither credible nor worthy of belief," and accepted Miss Burton's testimony that she found the revolver between a pair of trousers. Among the elements tending to negate appellant's credibility in the Magistrate's view were (1) his statement that he was obliged to pack his son's trousers because he had none of his own, although he claimed to have worked steadily as a registered plumber for sixteen years; (2) the fact that he packed several pairs of trousers, even though he contemplated only a short stay in Montgomery, Alabama; and (3) defendant's prior conviction for aggravated assault and battery with intent to murder. Opinion of Judge Naythons at 8-9.

9. Appellant here, of course, does not contend that the handgun in his luggage was not a deadly weapon within the meaning of 49 U. S.C. § 1472.