UNITED STATES of America, Appellee,

v.

Thomas Lawrence FLUM, Appellant.

No. 74–1288.

United States Court of Appeals, Eighth Circuit.

Submitted April 18, 1975.

Decided June 20, 1975.

Douglas McArthur, Lincoln, Neb., for appellant.

Daniel E. Wherry, Lincoln, Neb., for appellee.

Before GIBSON, Chief Judge, and HEANEY, BRIGHT, ROSS, STEPHENSON, WEBSTER and HENLEY, Circuit Judges, En Banc.*

WEBSTER, Circuit Judge.

Thomas Lawrence Flum was convicted in a jury-waived trial of attempting to board an aircraft while having about his person a concealed dangerous and deadly weapon, in violation of the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 1472(l).[1] In this appeal Flum contends that he was convicted upon insufficient evidence since there was no evidence tending to establish that he intended to conceal the knives which were discovered during a preboarding search of his carry-on luggage and personal belongings. The government, while arguing in the alternative that there was sufficient evi-

---

* Judge Lay did not participate in the above opinion.

1. At the time of the incident in question, the statute provided in relevant part:

   [W]hoever, while aboard an aircraft being operated by an air carrier in air transportation, has on or about his person a concealed deadly or dangerous weapon, or whoever attempts to board such an aircraft while having on or about his person a concealed deadly or dangerous weapon, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

   In 1974 the statute was slightly modified. *See* Air Transportation Security Act of 1974, Pub.L. 93–366, § 203 (Aug. 5, 1974), 1974 U.S. Code Cong. & Admin.News pp. 468–469. See note 8 *infra*.

dence of intent to conceal, first contends that the statute does not require proof of such intent. The District Court[2] so held and we agree.

The objective facts of the case are well established by the evidence. On July 20, 1973, defendant Flum, accompanied by some friends, arrived at the Lincoln Municipal Airport at approximately 5:20 p.m. He first went to the ticket counter and purchased a ticket. The agent instructed him to proceed immediately to the gate where the passengers on his flight were already boarding. The defendant proceeded to a security post through which passengers must pass before reaching the departure gate. During the security inspection which followed, guards discovered a switchblade knife with a 3¾ inch blade and a butcher knife with a 7⅛ inch blade. The butcher knife was found in a suitcase, wrapped in loose clothing. The switchblade knife was found inside a small gray box which was on the counter with other belongings.[3]

The essential elements of the relevant offense prohibited by 49 U.S.C. § 1472(1) are (1) attempting to board an aircraft (2) while carrying a deadly or dangerous weapon (3) which was concealed on or about the defendant's person. Flum was clearly attempting to board an aircraft, and the deadly and dangerous character of the knives is likewise not disputed.[4] What is disputed is whether the evidence showed beyond reasonable doubt that the weapons were "concealed" within the meaning of the statute.

*Specific Intent*

The defendant contends that the statute takes as its source the common law crime of carrying a concealed weapon and therefore requires the same proof of *mens rea*, that is, a specific intent to conceal. Flum testified that he had intended to check his bags in advance of boarding but lacked time to do so because he had arrived at the airport only five minutes prior to take-off time. Since no one inquired whether he had any weapons in his possession, he argues, his act of presenting his belongings for inspection negated any intent to conceal. If intent to conceal were an essential element of the offense, this would be a compelling argument.[5]

In *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), the defendant had been convicted of converting government bomb casings which he had found on a government target range while deer hunting. The district court had refused to instruct on the issue of intent, holding no intent to be required by the statute, and the Sixth Circuit had affirmed. On certiorari the Supreme Court reversed, holding that the statute, 18 U.S.C. § 641, made the offense a felony if the value of the property exceeded $100, that conviction would gravely besmirch the defendant as a thief, and that the offense was taken over from the common law, which required proof of intent. However, in distinguishing that case from cases based upon regulatory or "public welfare offenses," which do not require proof of

2. Honorable Robert Van Pelt, Senior United States District Judge, District of Nebraska.

3. One of the guards, Mrs. Dupong, testified that she saw defendant remove the box from a paper sack. Flum testified that the box was never in the sack. We resolve that issue, as we must, in the light most favorable to the government. *United States v. Swanson*, 509 F.2d 1205, 1210 (8th Cir. 1975); *United States v. Hutchinson*, 488 F.2d 484, 489 (8th Cir. 1973), *cert. denied sub nom. Ennis v. United States*, 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 2616 (1974).

4. The FAA guidelines furnished to preboard screening personnel define as dangerous:

KNIVES—All sabres, swords, hunting knives, and such other knives considered illegal by local law.

No contention is here made that the guards exceeded the guidelines in this case or that the knives were not in fact dangerous and deadly. Compare *United States v. Margraf*, 493 F.2d 1206 (3d Cir. 1974) (en banc).

5. In view of our holding, it is unnecessary to review the circumstantial evidence which the government alternatively contends would establish such intent. Moreover, the District Court made no finding with respect to intent, and were we to adopt defendant's interpretation of the statute, it would be necessary to remand for further proceedings.

intent, Justice Jackson explained the basis for the latter as follows:

> These cases do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities.

342 U.S. at 255–56, 72 S.Ct. at 246.

The provision of the statute [6] applicable to the instant case makes no reference to intent. In order then to determine whether the requirement of specific intent is nonetheless implied from the nature of the statute, we turn again to the classic test which Judge (now Justice) Blackmun announced for our court in *Holdridge v. United States*, 282 F.2d 302, 310 (8th Cir. 1960):

> From these cases emerges the proposition that where a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element is then not violative of the due process clause. Shevlin-Carpenter Co. v. State of Minnesota, 218 U.S. 57, 69–70, 30 S.Ct. 663, 54 L.Ed. 930; United States v. Balint [258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604] supra, page 252 of 258 U.S., at page 302 of 42 S.Ct.; Williams v. State of North Carolina, 325 U.S. 226, 238, 65 S.Ct. 1092, 89 L.Ed. 1577.

1. *Policy.* In 1961 Congress adopted certain amendments to the Federal Aviation Act of 1958, for the purpose of "extend[ing] Federal criminal laws to certain acts committed on board aircraft—in particular, such acts as aircraft 'hijacking', murder, manslaughter, assault, maiming, carrying concealed deadly or dangerous weapons, and stealing personal property." H.R. Report No. 958, 87th Cong., 1st Sess. (1961), 1961 U.S.Code Cong. & Admin.News, p. 2563. The report continues:

> A series of acts of a criminal nature recently committed aboard aircraft has dramatically underscored the gaps in existing law which can operate to provide criminals with a haven from prosecution.
>
> \* \* \* \* \* \*
>
> \* \* \* The committee feels that it is necessary and appropriate for the legislation to have this broad coverage if it is to operate as an effective deterrent to crime and promote safety in air commerce. While the legislation is intended to be as broad in its cover-

---

6. *See* note 1 *supra*.

age, geographic and otherwise, as its plain meaning indicates, it is not intended—and, of course, it cannot—extend beyond such limitations as may be imposed by the Constitution. * * *

* . * * * * *

Broad, stringent legislation such as is proposed here cannot, of course, prevent piracy of aircraft, but it is to be hoped that the enactment of laws providing stiff penalties for various crimes in air commerce will deter all except the hopelessly unbalanced from risking life and liberty in such undertakings.

1961 U.S.Code Cong. & Admin.News at pp. 2563–64.

Further in its report, the Committee on Interstate and Foreign Commerce explained the objective and application of subsection (1), now 49 U.S.C. § 1472(1):

Subsection (1) would make it unlawful, with certain exceptions stated below, for any person * * * to attempt to board any * * * aircraft while having on or about his person a concealed deadly or dangerous weapon.

1961 U.S.Code Cong. & Admin.News at p. 2574.

The exceptions mentioned deal with possession of weapons by law enforcement officers or other authorized persons. Nowhere in the report is found any inference of a congressional purpose or policy that intent to conceal must be demonstrated in order to prove the fact of concealment. Instead, a clear legislative intent is expressed that the reach of the legislation be "as broad in its coverage * * * as its plain meaning indicates," subject only to constitutional limitations, none of which are in question here.

2. *Standard.* We cannot say that the standard expressed in the plain meaning of subsection (1) is unreasonable. A demonstrated need to halt the flow of weapons on board aircraft, which had exposed to peril large numbers of passengers and jeopardized the integrity of commercial travel, justified a stringent rule, adherence to which was properly expected of all persons traveling by air, for their mutual safety.

3. *Penalty.* The statutory penalty, a maximum fine of $1000 or imprisonment for not more than one year, or both, makes the offense a misdemeanor, see 18 U.S.C. § 1, and is thus "relatively small." Moreover, other amendments to the Act which were adopted at the same time as subsection (1) both require evidence of wilfulness and provide for more stringent penalties,[7] adding weight to the inference that the penalty here was a further manifestation of a congressional purpose that subsection (1) should define a no-intent offense.[8]

4. *Effect of Conviction.* Little need be said of the fourth requirement. Conviction of this offense does not gravely besmirch; it does not brand the guilty person as a felon or subject him to any burden beyond the sentence imposed.

5. *Source of Statute.* It is argued that the statute makes into a federal offense that which was an offense at common law: carrying a concealed weapon. The common law offense required proof of an intent to conceal; hence, defendant argues, the statute impliedly contains the same requirement. We find sufficient differences in the offense defined by subsection (1), along with the other factors considered herein, to conclude that Congress did not intend to adopt *in toto* the "cluster of ideas" associated with the words "concealed

---

**7.** Both before and after the 1974 amendments, 49 U.S.C. § 1472(i) authorized a minimum penalty of 20 years imprisonment for aircraft piracy, defined to include an element of "wrongful intent." See also, *e.g.*, 49 U.S.C. § 1472, subsections (b), (c), (f) and (m)(2).

**8.** In 1974 the statute was amended to extend the provisions of subsection (1) to include

"any bomb, or similar explosive or incendiary device * * *." *See* note 1 *supra*. In addition, Congress made it a felony offense to "willfully and without regard for the safety of human life * * * commit an act prohibited by * * * this subsection * * *."

weapons." *See Morissette v. United States, supra,* 342 U.S. at 263, 72 S.Ct. 240, 96 L.Ed. 288; *United States v. Freed,* 401 U.S. 601, 608, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971). The conventional common law concealed-weapons offense makes it a crime to carry a weapon upon one's person with the specific intent to conceal it. The thrust of the federal statute, a misdemeanor, is to prohibit entry of an airplane with such weapon concealed upon one's person. The offense is not simply carrying the concealed weapon about one's person, but in boarding or attempting to board an aircraft with it.

6. *Congressional Purpose Supporting.* The Congress, as demonstrated *supra,* sought to promote safety in aircraft by extending the federal criminal laws to aircraft-related acts as a deterrent to crime. This purpose supports the conclusion that Congress did not intend to impede the deterrent effect of its statute by imposing upon the government prosecutor the added burden of showing the state of mind of the person found attempting to board an aircraft with a deadly or dangerous concealed weapon. If conviction depended upon proof of misrepresentation at the security gate or some other furtive act inconsistent with innocence, then the congressional purpose to keep weapons out of the passenger section of aircraft would depend entirely upon the thoroughness of the inspection, since in almost every case a person who presented his bags for inspection would thereby have rebutted in advance a claim that he possessed a specific criminal intent to conceal. To the contrary, we think the congressional purpose of keeping weapons from being tak-

en on board airplanes by passengers fully supports the conclusion that intent to conceal is not an essential element of the offense.[9]

Two recent cases point to the same conclusion. In *United States v. Margraf,* 483 F.2d 708 (3d Cir. 1972) (en banc), *vacated on other grounds,* 414 U.S. 1106, 94 S.Ct. 833, 38 L.Ed.2d 734 (1973), *on remand,* 493 F.2d 1206 (1974), the defendant had been apprehended while attempting to board an airplane with a pocket knife in his right front pocket. In that case the defendant contended the government must prove that he *knew* the weapon was dangerous and that he *intended* to use it on board. The majority opinion, while focusing upon a slightly different aspect of intent, held that 49 U.S.C. § 1472(*1*) did not require a specific intent. The fact that Margraf was asked whether he was carrying a knife or weapon and denied it does not form a basis for distinguishing that case, because the holding was that proof of specific intent was not required by the statute.

In discussing the material elements of the offense proscribed by 49 U.S.C. § 1472(*1*), the Ninth Circuit, in *United States v. Dishman,* 486 F.2d 727 (9th Cir. 1973), observed:

> Any necessary element of present or later developed intent to make use of the 'deadly and dangerous' weapon in the commission of a crime while aboard the aircraft is conspicuous by its utter absence.

486 F.2d at 730.

It concluded that "[s]ubsection (*1*) is a non-intent statute   *  *  *."   *Id.* at 732.[10]

---

**9.** Defendant relies upon *United States v. Brown,* 508 F.2d 427 (8th Cir. 1974), wherein a divided panel of this court reversed and remanded on the issue of concealment. The case was originally tried to a United States Magistrate upon a stipulation of the facts, which included a stipulation that a tear gas gun was located inside a flight bag. The district court affirmed, holding that the concealment of the weapon had been "amply proved." *United States v. Brown,* 376 F.Supp. 451, 457 (W.D.Mo.1974). The majority held that the stipulated evidence was equivocal, that the

magistrate had failed to make a specific finding of concealment, and that the district court as the reviewing court lacked power to enter a de novo finding; accordingly it remanded the case for further proceedings. To the extent that any dicta therein may impliedly suggest that intent is a necessary ingredient of the element of concealment, we decline to follow it, in light of our en banc holding today.

**10.** No issue of scienter is present in this case. It is undisputed that defendant knew the nature and approximate location of each of the

## Concealment

While intent to conceal is not an essential element of the offense and therefore need not be established in order for the prosecution to make a submissible case, the fact of concealment is an essential element and must be proved beyond reasonable doubt.

The classic definition of a concealed weapon is one which is hidden from ordinary observation. *People v. Barksdale*, 14 Ill.App.3d 415, 302 N.E.2d 718, 722 (1973); *People v. Colson*, 14 Ill. App.3d 375, 302 N.E.2d 409, 410 (1973); *Smith v. State*, 18 Md.App. 612, 308 A.2d 442, 444 (1973); *People v. Jackson*, 43 Mich.App. 569, 204 N.W.2d 367, 368 (1972); *State v. Pettit*, 20 Ohio App.2d 170, 49 Ohio Opinions 2d 200, 252 N.E.2d 325, 328 (1969). This definition comports with the plain meaning of subsection (*1*) and we reject defendant's suggestion that "concealed weapon" is a term of art by which Congress intended to imply a common law requirement of intent. A submissible case is made when the government establishes that a person has attempted to board an aircraft with a dangerous or deadly weapon on or about his person which is hidden from view.

We do not intimate that the weapon must in all cases be in open view prior to inspection. The trier of the fact could consider, for example, evidence offered on behalf of the defendant that he had informed the inspector of the presence and location of a deadly or dangerous weapon among his belongings. The obviousness of the weapon is a factor to be taken into consideration under all of the relevant facts and circumstances. Concealment under subsection (*1*) of the statute is measured by what a defendant did or failed to do, not by his intent. The inspection process in a particular case may be an objective fact to be considered with other objective facts on the issue of concealment. Not every inspection will uncover a concealed weapon, and no congressional purpose to let the

fact of a security inspection operate as an absolute defense to the charge can be found in either the statute or its legislative history. Each case must stand upon its own facts.

While defendant submitted his bags and belongings to an inspection, as he was required to do, this objective fact was insufficient to overcome as a matter of law the finding of the District Court that the knives were concealed, a finding which is fully supported by the evidence.

It will be argued that the statute thus construed may operate harshly upon passengers boarding aircraft with articles which potentially are deadly or dangerous weapons. Balanced against the heavy risks to large numbers of passengers, including those who would carry such weapons on board with no evil purpose, we cannot say that the resulting effect is too severe. It requires no recitation of recent history to remind us that such risks are real, and in comparison, the statute—broad though its reach may be—is a reasoned response to a demonstrated need.

Affirmed.

HEANEY, Circuit Judge (dissenting).

I respectfully dissent. It is my view that an essential element of the crime embodied in 49 U.S.C. § 1472(*1*) is intent to conceal. While the requisite intent may have been present in this case, the issue was not considered by the factfinder. Accordingly, I would find error in the District Court's ruling that intent is not an element of the offense.

I start from principles fundamental to our system of criminal justice:

The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of

knives. *Compare United States v. Lee*, 383 F.Supp. 1033 (E.D.Tenn.1974) (requiring proof of knowledge but not intent), *with United States v. Harris*, 381 F.Supp. 1095 (E.D.Pa. 1974) (holding proof neither of knowledge nor of intent required).

the normal individual to choose between good and evil. \* \* \*

Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil. As the states codified the common law of crimes, even if their enactments were silent on the subject, their courts assumed that the omission did not signify disapproval of the principle but merely recognized that intent was so inherent in the idea of the offense that it required no statutory affirmation. \* \* \*

\* \* \* \* \* \*

\* \* \* The purpose and obvious effect of doing away with the requirement of a guilty intent is to ease the prosecution's path to conviction, to strip the defendant of such benefit as he derived at common law from innocence of evil purpose, and to circumscribe the freedom heretofore allowed juries. Such a manifest impairment of the immunities of the individual should not be extended to common-law crimes on judicial initiative.

The spirit of the doctrine which denies to the federal judiciary power to create crimes forthrightly admonishes that we should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute. And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise in-

structed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them. *Morissette v. United States*, 342 U.S. 246, 250–252, 263, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952). *See United States v. Freed*, 401 U.S. 601, 607–608, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971).

My interpretation of 49 U.S.C. § 1472(*1*) is consistent with those principles. When Congress enacted this statute, using language similar or identical to that employed by the states in prohibiting the carrying of concealed weapons, it can only be presumed that it meant to retain the common law meaning that universally required intent to conceal. At common law, the carrying of a concealed weapon was not a crime unless the weapon was concealed "knowingly," "intentionally" and/or "consciously." *See, e. g., State v. Jordan*, 495 S.W.2d 717, 720 (Mo.1973); *Nugent v. State*, 104 Neb. 235, 176 N.W. 672 (1920); *State v. Williams*, 184 Iowa 1070, 169 N.W. 371, 372 (1918); 3 Wharton's Criminal Law and Procedure (Anderson Ed. 1957) at 119; 43 A.L.R.2d 492, 510, 518–521. These words connote that the actor committed the prohibited acts either with the purpose of concealing the weapon or knowing that the weapon would be concealed.[1] *See* Working Papers of the National Commission on Reform of Federal Criminal Laws (Vol. I 1970) at 123–124; Black's Law Dictionary (Revised Fourth Ed. 1968) at 948, 1012. Culpability, in addition to the prohibited act, was required before the actor could be labeled a criminal.

The majority's reliance upon *United States v. Margraf*, 483 F.2d 708 (3rd Cir. 1973) (en banc), *vacated on other grounds*, 414 U.S. 1106, 94 S.Ct. 833, 38 L.Ed.2d 734 (1973), *on remand*, 493 F.2d 1206 (1974) (remanded to the District Court to allow the government to dis-

---

1. The mental element, or *mens rea*, required at common law was in addition to the mental process required to commit the prohibited act. All acts are accompanied by a mental process directing the physical movement. *Mens rea*, on the other hand, is an awareness of the consequences of the physical act. *See* Mueller, On Common Law Mens Rea, 42 Minn.L. Rev. 1043 (1958).

miss the complaint), and *United States v. Dishman*, 486 F.2d 727 (9th Cir. 1973), is misplaced. Neither case turned on the question of whether an intent to conceal was necessary. *Dishman* stated only that:

> Any necessary element of present or later developed intent to make use of the "deadly and dangerous" weapon in the commission of a crime while aboard the aircraft is conspicuous by its utter absence.

*United States v. Dishman, supra* at 730. And, *Margraf* stated:

> A person who boards a plane with a concealed deadly weapon need not intend to use it to be a hazard[2] * * *

*United States v. Margraf, supra* at 710.

Proof that a weapon was concealed intentionally can, of course, be established circumstantially by inference from the objective facts and circumstances. An admission by the defendant is not necessary for a successful prosecution. *See, e. g., State v. Jordan, supra* at 721; *Nugent v. State, supra* at 672; *State v. Williams, supra* at 371.

The decision of the majority of this Court that imposes criminal liability without regard to the intent of the actor, strict criminal liability, is not only contrary to the common law but is unnecessary for the fulfillment of the Congressional purpose.[3] The stated purpose of the statute is deterrence:

> The provisions of this legislation, it will be noted, are based on the use of criminal sanctions as a deterrent to the commission of criminal acts. * *

> * * * * * *

> Broad, stringent legislation such as is proposed here cannot, of course, prevent piracy of aircraft, but it is to be hoped that the enactment of laws providing stiff penalties for various crimes in air commerce will deter all except the hopelessly unbalanced from risking life and liberty in such undertakings.

1961 U.S.Code Cong. & Admin.News, pp. 2563–2564.

This policy of deterrence, as recognized by Congress, will have no effect upon the "hopelessly unbalanced;" it will also have no effect upon those who act innocently, without the intent to conceal.

The justification for imposing criminal liability where there is no fault has been that enforcement of society's demands requires it. * * * If a person's conduct has been truly without fault, however, the threat of punishment will not favorably affect his conduct. The imposition of punishment is not needed to "reform" or "rehabilitate" him; no fault requiring correction has been identified. Punishment, if it takes the form of detention, will prevent him from engaging in the conduct while he is detained. It may also satisfy the community's (irrational) demand for retribution for the harm which the conduct caused.

These slight functions which can be served are manifestly inadequate justifications for criminal liability without fault. Preventive detention of the kind involved here has no place in the criminal law. It is unlikely that the community will feel strongly about offenses of this kind (although it may strongly support regulation of the activity involved), particularly when there is no culpability, and unlikelier still that, if the community has such feelings, they will be so strong that they should be recognized for the sake

---

2. Some states required more than the intentional concealment of the weapon and held that the act was not a crime unless the accused intended to use the concealed weapon in an unlawful manner. *See* 3 Wharton's Criminal Law and Procedure (Anderson Ed. 1957) at 117–118.

3. * * * In the absence of an overriding policy objective which requires the use of criminal sanctions where moral blame does not attach, it is surely preferable to make criminal law conform to moral judgment.

Working Papers of the National Commission on Reform of Federal Criminal Laws (Vol. I 1970) at 130.

of the community, despite their irrationality.

Working papers, *supra* at 129.

The decision of the majority permits imposition of criminal liability upon the housewife who carries scissors in her sewing bag; the fisherman who carries a scaling knife in his tackle box; the professional who carries a letter opener in his briefcase; the doctor who carries scalpels in his medical bag; and the tradesman who carries a hammer in his tool kit.

The majority attempts to avoid this problem by pointing out that concealment is always a factual question and that all facts and circumstances can be considered in determining whether a weapon has been concealed. This ambiguous language may be taken by some as requiring that an intent to conceal be found, but I am not willing to leave the matter in such an ambiguous state. I agree that an oral disclosure of the weapon and the obviousness of its presence upon the physical search rebut the criminal act. They also rebut the criminal intent. The understandable failure to orally disclose the existence of a weapon, when momentarily the contents of the hand luggage will be subjected to a full search, or the fortuitous manner in which a passenger packs his hand luggage should not be the sole factors determining guilt. Only by preserving the defendant's opportunity to put before the jury evidence that the act of concealment was without culpability will the innocent be protected. Easing the prosecutor's burden cannot be justified when the result is injustice.

It is not the imposition of criminal liability upon those who innocently carry

weapons in their hand luggage but the preflight boarding searches that will "halt the flow of weapons on board aircraft." *Supra* at 43. This extraordinary procedure[4] is the practical method Congress has chosen to insure flight safety. The requirement of intent as an essential element of 49 U.S.C. § 1472(*l*) will not undermine that procedure or its purpose. The intent requirement will only insure that prosecutions under the statute will be limited to those persons who would be deterred thereby. The statute should not be construed to serve a purpose it cannot achieve.

The troublesome problem of selective enforcement is also aggravated by the majority's decision. As revealed in the Federal Aviation Administration's First Semi-Annual Report to Congress on the Effectiveness of Passenger Screening Procedures, 67,710 weapons were detected in 1974. As a result thereof, however, only 1,147 arrests for weapons related offenses were made. The percentage of arrests made to weapons detected was 1.69%.[5] It is apparent that the security officer possesses an enormous amount of unreviewable discretion. The decision of a majority of this Court increases that discretionary power and places the determination of innocence in the hands of the police.

In the total system of police discretion, one fundamental failure is the continued enactment of statutes which go far beyond the limits of effective law enforcement. *Criminal statutes which overshoot are a prime cause of avoidable injustice*, because such statutes inevitably result in selective enforcement, and cases are often selected for enforcement on irrational grounds.

---

**4.** Congress recognized the unprecedented nature of preflight searches:

> The routine search of a person is completely foreign to our constitutional protections. We have never legislatively countenanced a police or security officer interruption and search of an individual lawfully conducting himself. Because of the high incidence of aircraft hijacking and the gravity of these offenses, the conferees have reluctantly approved a security system which

does allow routine searches of passengers in contradiction to our cherished constitutional freedom. At best such a search is unpleasant. * * * The legalization of these searches is a serious inroad into our basic individual right to privacy. * * *

1974 U.S.Code Cong. & Admin.News, pp. 4009–4010.

**5.** I am unaware of any statistics revealing the number of passengers ultimately charged and convicted.

A major means of reducing injustice is by tailoring criminal statutes to what can be rather fully enforced.

Davis, Discretional Justice, A Preliminary Inquiry 91 (1969) (Emphasis included.).

Here the fault is not legislative but judicial.